William J. VINCENT and Judy S. Vincent, individually
and as parents of Tonya M. Vincent, Carol Bartlein,
individually and as parent of Kurt Bartlein, Sara Bar-
tlein and Kimberly Bartlein, Pam Britten,
individually and as parent of Travis Britten, Cortney
Britten and Taylor Britten, Karen Drazkowski,
individually and as parent of Steve Drazkowski and
Ann Drazkowski, Michael Endress and Susan
Endress, individually and as parents of Jill Endress
and Megan Endress, Michael J. Fairchild and Juliana
Schmidt, individually and as parents of Kara B.
Fairchild and Alexander R. Fairchild, Charles
Hetfield, individually and as parent of Angela
Hetfield, Rebecca Hetfield and Brock Hetfield, John
Keller and Kathleen Keller, individually and as
parents of Courtney K. Keller, Lynn Klatt, individu-
ally and as parent of Leslie Klatt and Ross Klatt and
as foster parent of Blade Corrente, William Loasching,
individually and as parent of Kelly Loasching, Kari
Loasching, Kirt Loasching and Katie Loasching, Mar-
garet McGinnity and Thomas McGinnity, individually
and as parents of Ann McGinnity, Kate McGinnity,
Megan McGinnity, and Betsy McGinnity, Joyce A.
Olson, individually and as parent of Casey Brouhard
and Robert Brouhard, Denise Callaway Reistad and
Gary Reistad, individually and as parents of George
Reistad, Kelsey Reistad and Sonja Reistad, Mary
Rochon-Jewert, individually and as parent of Keith
Jewert and Candyl Jewert, Pao Vang, individually
and as parent of Phong Vang, Lee Vang, Mary Vang,
See Vang, Toua Vang, Sheng Vang, Lue Vang, Xay
Vang and Jenny Vang, Gloria Wahl, individually and

as parent of Jordan Woods-Wahl, Ronald J. Walsh, individually and as parent of Ryan J. Walsh and Laura M. Walsh; and, Jacqueline Ward, individually and as parent of Jessica Justiniano and Tatiana Justiniano, Tonya M. Vincent, Kurt Bartlein, Sara Bartlein, Kimberly Bartlein, Travis Britten, Cortney Britten, Taylor Britten, Steve Drazkowski, Ann Drazkowski, Jill Endress, Megan Endress, Kara B. Fairchild, Alexander R. Fairchild, Angela Hetfield, Rebecca Hetfield, Brock Hetfield, Courtney K. Keller, Leslie Klatt, Ross Klatt, Blade Corrente, Kelly Loasching, Kari Loasching, Kirt Loasching, Katie Loasching, Ann McGinnity, Kate McGinnity, Megan McGinnity, Betsy McGinnity, Casey Brouhard, Robert Brouhard, George Reistad, Kelsey Reistad, Sonja Reistad, Keith Jewert, Candyl Jewert, Phong Vang, Lee Vang, Mary Vang, See Vang, Toua Vang, Sheng Vang, Lue Vang, Xay Vang, Jenny Vang, Jordan Woods-Wahl, Ryan J. Walsh, Laura M. Walsh, Jessica Justiniano and Tatiana Justiniano, minors, on behalf of themselves and all other public school students and prospective students in the State of Wisconsin similarly situated; and, Mary Bills, Douglas Haselow, Ray Heinzen, Mary Lohmeier, David Smette and Jerome A. Sommer, on behalf of themselves and all other property taxpayers in the State of Wisconsin similarly situated; and Ray Heinzen, Mary Lohmeier and Roland Rockwell, on behalf of themselves and all other citizens of the State of Wisconsin similarly situated; and, School District of Abbotsford and its School Board, School District of Algoma and its School Board, School District of Alma and its School Board, School District of Alma Center-Humbird Merrillan and its School Board, School District of Ashland and its School Board, School District of Augusta and its

589

School Board, Baldwin-Woodville Area School District and its School Board, Barron Area School District and its School Board, School District of Bayfield and its School Board, School District of Beecher-Dunbar-Pembine and its School Board, School District of Beloit and its School Board, School District of Benton and its School Board, Berlin Area School District and its School Board, School District of Black Hawk and its School Board, School District of Black River Falls and its School Board, School District of Bloomer and its School Board, Boyceville Community School District and its School Board, School District of Cadott Community and its School Board, School District of Cameron and its School Board, School District of Cashton and its School Board, School District of Chetek and its School Board, Clayton School District and its School Board, School District of Clear Lake and its School Board, Clintonville Public School District and its School Board, Cochrane-Fountain City Community School District and its School Board, School District of Colfax and its School Board, School District of Cornell and its School Board, School District of Cuba City and its School Board, School District of Denmark and its School Board, Desoto Area School District and its School Board, Dodgeland School District and its School Board, Dodgeville School District and its School Board, School District of Durand and its School Board, Elk Mound Area School District and its School Board, School District of Elmwood and its School Board, School District of Fall Creek and its School Board, Frederic School District and its School Board, School District of the City of Galesville, Villages of Ettrick and Trempealeau, Towns of Caledonia, Dodge, Ettrick, Gale and Trempealeau in Trempealeau County and the Town of North Bend in

Jackson County and its School Board, School District of Gilmanton and its School Board, School District of Grantsburg and its School Board, School District of Greenwood and its School Board, School District of Holmen and its School Board, School District of Horicon and its School Board, School District of Howard-Suamico and its School Board, Kewaunee School District and its School Board, Kickapoo Area School District and its School Board, School District of La Crosse and its School Board, School District of Lake Holcombe and its School Board, School District of Laona and its School Board, Lena Public School District and its School Board, School District of Luck and its School Board, Manitowoc Public School District and its School Board, School District of Marion and its School Board, School District of Mayville and its School Board, Medford Area Public School District and its School Board, School District of the Menomonie Area and its School Board, Milwaukee Public Schools and the Board of School Directors of the City of Milwaukee, Mineral Point Unified School District and its School Board, School District of Mondovi and its School Board, School District of Mosinee and its School Board, Necedah Area School District and its School Board, School District of New Richmond and its School Board, North Crawford School District and its School Board, Oconto Falls School District and its School Board, Oconto Unified School District and its School Board, Osseo-Fairchild School District and its School Board, School District of Owen-Withee and its School Board, Pepin Area School District and its School Board, School District of Phillips and its School Board, School District of Poynette and its School Board, Prairie Farm Public School District and its School Board, Pulaski Community School

District and its School Board, Racine Unified School District and its School Board, Reedsville School District and its School Board, School District of Rib Lake and its School Board, Rice Lake Area School District and its School Board, Riverdale School District and its School Board, River Ridge School District and its School Board, Saint Croix Central School District and its School Board, School District of Seneca and its School Board, Seymour Community School District and its School Board, School District of Shell Lake and its School Board, School District of Siren and its School Board, School District of Somerset and its School Board, Southwestern Wisconsin Community School District and its School Board, School District of Spring Valley and its School Board, School District of Stratford and its School Board, School District of Superior and its School Board, School District of Thorp and its School Board, School District of Tigerton and its School Board, Tomah Area School District and its School Board, Valders Area School District and its School Board, Viroqua Area School District and its School Board, School District of Wabeno Area and its School Board, School District of Washburn and its School Board, School District of Waupun and its School Board, Joint School District, Villages of Wauzeka and Steuben, Towns of Wauzeka, Bridgeport, Eastman, Haney, Marietta and Prairie du Chien and its School Board, School District of West Salem and its School Board, School District of Weston and its School Board, Weyerhauser Area School District and its School Board, School District of Winter and its School Board, School District of Wonewoc and Union Center and its School Board, and Mary Bills, Pam Britten, and Lynn Klatt, on behalf of themselves and all other school board members in the State of

Wisconsin similarly situated, Plaintiffs-Co-Appellants-Petitioners,
Terrance CRANEY, Guy Costello, Regina Washinawatok, Jeffrey Erhardt, Kathleen Hildebrandt, Randy Kuivinen, William Nelson, Douglass Thomas, and Wisconsin Education Association Council, Intervening Plaintiffs-Appellants-Petitioners,

v.

Jack C. VOIGHT, in his official capacity as State of Wisconsin Treasurer, John T. Benson, in his official capacity as State of Wisconsin Superintendent of Public Instruction, Wisconsin Department of Public Instruction, Cate Zeuske, in her official capacity as Secretary of the Wisconsin Department of Revenue, and Wisconsin Department of Revenue, Defendants-Respondents.

Supreme Court

*No. 97–3174. Oral argument February 8, 2000.—Decided July 11, 2000.*

2000 WI 93

(Also reported in 614 N.W.2d 388.)

594

For the intervening plaintiffs-appellants-petitioners there were briefs by *Bruce Meredith, Chris Galinat* and *Wisconsin Education Association Council*, Madison, and *Robert H. Friebert* and *Friebert, Finerty & St. John, SC*, Milwaukee, and oral argument by *Bruce Meredith*.

For the plaintiffs-co-appellants-petitioners there were briefs by *David J. Hase, Heidi L. Vogt* and *Cook & Franke, S.C.*, Milwaukee, and oral argument by *David J. Hase*.

For the defendants-respondents the cause was argued by *Peter C. Anderson*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general, and *Bruce A. Olsen*, assistant attorney general.

Amicus Curiae brief by *Patricia A. Brannan, Alethia Nancoo* and *Hogan & Hartson, L.L.P.*, Washington, D.C., on behalf of The Council of the Great City Schools.

Amicus Curiae brief by *Gary E. Sherman* on behalf of State Representatives Gary E. Sherman, Dan Schooff, John H. Ainsworth, Tom Sykora, Shirley I. Krug, Marlin D. Schneider, Peter E. Bock, Robert L. Turner, Julie M. Lassa, Mary Hubler, G. Spencer Coggs, Pedro A. Colon, Barbara Gronemus, Donald W. Hasenohrl, John W. Lehman, Mark Miller, Joe Plouff, Jon Richards, Marty Reynolds, Christine Sinicki and

State Senators Brian D. Rude, Brian B. Burke, Gwendolynne S. Moore, Kimberly M. Plache.

Amicus Curiae brief by *Raymond P. Taffora, Jordan J. Hemaidan, Karla M. Davis* and *Michael, Best & Friedrich LLP*, Madison, on behalf of Fair Aid Coalition.

Amicus Curiae brief by *Lawrence A. Wiley* on behalf of Governor Tommy G. Thompson.

Amicus Curiae brief by *James D. Peterson, Brady C. Williamson* and *LaFollette Sinykin, LLP*, Madison, on behalf of Institute for Wisconsin's Future, Inc., Wisconsin Coalition for Advocacy, Inc., and Wisconsin Parent Teachers Association.

Amicus Curiae brief by *Péter M. Koneazny* on behalf of American Civil Liberties Union of Wisconsin, Inc.

Amicus Curiae brief by *James D. Peterson, Brady C. Williamson* and *LaFollette Sinykin, LLP*, Madison, on behalf of City of Milwaukee Mayor John Norquist.

¶ 1. N. PATRICK CROOKS, J. The Petitioners in this case are various Wisconsin students, parents, teachers, school districts, school board members, citizens, and the president of the Wisconsin Education Association Council (WEAC).[1] The Petitioners collec-

---

[1] We remember Ralph Waldo Emerson's words to the Harvard graduating class of 1837:

> [T]here is a portion of reading quite indispensible to a wise man [or woman]. History and exact science he [or she] must learn by laborious reading. Colleges [and public schools], in like manner, have their indispensable office—to teach elements. But they can only highly serve us when they aim not to drill, but to create; when they gather from far every ray of various genius to their hospitable halls, and by the concentrated fires, set the hearts of their youth on flame. Thought and knowledge are natures in which apparatus and

tively challenge the constitutionality of the state school finance system under Wis. Stat. ch. 121 and Wis. Stat. §§ 79.10 and 79.14. Two main issues are presented for our review: 1) whether the state school finance system is unconstitutional under Wis. Const. art. X, § 3—the uniformity clause of the education article; and 2) whether the state school finance system is unconstitutional under Wis. Const. art. I, § 1—the Equal Protection Clause. The Petitioners contend that the school finance system violates both art. X, § 3 and art. I, § 1 because it fails to equalize access to financial resources among school districts.

¶ 2. In an unpublished decision, the court of appeals upheld the constitutionality of the school finance system. *Vincent v. Voight*, No. 97–3174, unpublished slip op. (Ct. App. Dec. 23, 1998). The court determined that the current school finance system is not materially different from the system that this court upheld as constitutional in *Kukor v. Grover*, 148 Wis. 2d 469, 436 N.W.2d 568 (1989).[2] Slip op. at 6. We agree

---

pretension avail nothing. Gowns and pecuniary foundations, though of towns of gold, can never countervail the least sentence or syllable of wit. Forget this, and our American colleges [and public schools] will recede in their public importance, whilst they grow richer every year.

Ralph Waldo Emerson, "The American Scholar" *in Ralph Waldo Emerson: Essays and Journals*, 1837, at 37 (Lewis Mumford ed., 1968) (words added in brackets).

[2] We hold that this case presents a justiciable issue. In *Baker v. Carr*, 369 U.S. 186, 211 (1962), the United States Supreme Court stated that a court must decide on a case-by-case inquiry whether a so-called political issue is justiciable, and "[d]eciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in

that the Petitioners have not proved beyond a reasonable doubt that the current state school finance system violates either art. X, § 3 or art. I, § 1 of the Wisconsin Constitution. The present school finance system more effectively equalizes the tax base among districts than the system in place at the time *Kukor* was decided.

¶ 3. We further hold that Wisconsin students have a fundamental right to an equal opportunity for a

---

constitutional interpretation. . . ." This court on numerous occasions has interpreted the state constitution to find that assessing the constitutionality of the state school finance system is within its province. *See, e.g., Kukor v. Grover*, 148 Wis. 2d 469, 436 N.W.2d 568 (1989); *Busé v. Smith*, 74 Wis. 2d 550, 247 N.W.2d 141 (1976); *State ex rel. Zilisch v. Auer*, 197 Wis. 284, 221 N.W. 860 (1928).

In *Kukor* the court of appeals specifically certified the issue of whether the judiciary has the power to declare the system of financing unconstitutional, after the circuit court found that " '[w]hether a higher degree of uniformity is now 'practicable' is for the Legislature to decide. . . . The battle over scarce tax dollars for education is a political one. . . . The Legislature is where the framers of the constitution intended these decisions to be made.' " *Kukor*, 148 Wis. 2d at 483 n.8. This court clearly concluded that it does have that power by proceeding to examine the constitutionality of the school finance system. Moreover, in *Busé*, 74 Wis. 2d at 581, we held a portion of the school finance system unconstitutional. There we specifically stated, "to hold that the legislature is constitutionally mandated to provide an equal opportunity for education. . .is not necessarily to validate as constitutional any means chosen by the legislature to achieve that end." *Id.* at 567. We are satisfied that the issues presented to us in this case are appropriate for decision by this court in the exercise of our constitutional role. This is an area where all three of the co-equal branches of state government share power and authority consistent with the Wisconsin Constitution. It is indeed "a delicate exercise in constitutional interpretation."

sound basic education. An equal opportunity for a sound basic education is one that will equip students for their roles as citizens and enable them to succeed economically and personally. The legislature has articulated a standard for equal opportunity for a sound basic education in Wis. Stat. §§ 118.30(1g)(a) and 121.02(L) (1997–98) as the opportunity for students to be proficient in mathematics, science, reading and writing, geography, and history, and for them to receive instruction in the arts and music, vocational training, social sciences, health, physical education and foreign language, in accordance with their age and aptitude.[3] An equal opportunity for a sound basic education acknowledges that students and districts are not fungible and takes into account districts with disproportionate numbers of disabled students, economically disadvantaged students, and students with limited English language skills. So long as the legislature is providing sufficient resources so that school districts offer students the equal opportunity for a sound basic education as required by the constitution, the state school finance system will pass constitutional muster.

I

A. *The Wisconsin School Finance System*

¶ 4. We begin by outlining the constitutional provisions applicable to school finance. Article X of the Wisconsin Constitution establishes the state public school system[4] and provides that the school districts

---

[3] See Wis. Stat. §§ 118.30(1g)(a) and 121.02(L) (1997–98).

[4] The constitution refers to "common schools," "normal schools," and "district schools," instead of "public schools," which is the general terminology used today. Wis. Const. art. X, §§ 2(1), 2(2), and 3. Common schools, district schools, and nor-

601

"shall be as nearly uniform as practicable. . . ." Wis. Const. art. X, § 3. The constitution also creates a school fund for the "support and maintenance" of schools and libraries. Wis. Const. art. X, § 2. Article X, § 4 allows for the imposition of a local tax on the school districts. It states that the sum to be raised locally must be "not less than one-half the amount received by such town or city respectively for school purposes from the income of the school fund." Wis. Const. art. X, § 4. Section 5 provides for the distribution of the income from the school fund "in some just proportion to the number of children and youth resident therein between the ages of four and twenty years." Wis. Const. art. X, § 5.

¶ 5. From these constitutional provisions, the legislature has developed an elaborate state school finance formula.[5] One source of school funding is the property tax, which applies directly to each local district. The other significant source of funding is state aid.[6] State aid includes equalization aid, categorical aid, and the school levy tax credit.[7] We describe each type of aid in turn.

---

mal schools were all forms of publicly funded schools. *See generally*, Conrad E. Patzer, *Public Education in Wisconsin* (1924).

[5] The state appropriated approximately $7.72 billion in school aid for 1997–99 biennium budget. Wisconsin Legislative Fiscal Bureau, *Elementary and Secondary Sch. Aids* 1 (Jan. 1999).

[6] The federal government also contributes a limited amount of aid to school districts, which is generally used for special education and remedial education. *Elementary and Secondary Sch. Aids* at 3. The amount of this aid is not significant for the purposes of this case, so we do not address it further in this opinion.

[7] The legislature, as part of Wis. Stat. ch. 121—the chapter on school finance—further includes a provision on school dis-

## EQUALIZATION AID

¶ 6. According to the Legislative Fiscal Bureau, equalization aid "is intended to ensure that differences in tax rate primarily reflect differences in school district spending levels."[8] Wisconsin Legislative Fiscal Bureau, *Elementary and Secondary Sch. Aids* at 10 (Jan. 1999). Equalization aid is distributed on the basis of a school district's relative fiscal capacity. *Id.* at 1. The majority of school funds are derived from property taxes. However, since the property tax base differs between districts, the state distributes equalization aid according to the formula set forth in Wis. Stat. § 121.07 (1997–98).[9] Equalization aid provides each qualifying school district with a guaranteed tax base, thereby

---

trict standards, which directs school boards to maintain certain licensure requirements, facility and curriculum standards, and standardized testing procedures. Wis. Stat. § 121.02 (1997–98). This statute is incorporated into the subchapter on general aid. Section 121.02(L) directs local school boards to provide regular instruction in particular courses in the elementary grades, grades 5–8, and grades 9–12.

[8] We note that equalization aid is a component of general school aids. *Elementary and Secondary Sch. Aids* at 1. Other general school aids include integration aid and special adjustment aid. *Id.* at 11. We only discuss equalization aid in detail because many school districts do not receive either integration aid or special adjustment aid. *Id.* at 12. A school district receives integration aid when it transfers students to change the racial balance of the district. *Id.* Special adjustment aid is given to a district that is experiencing a reduction in general school aid, or when a school district is consolidating. *Id.* at 13. We also note that a portion of the School District of Milwaukee's equalization aid goes toward paying for the Milwaukee Parental Choice Program and charter schools. *Id.* at 13–14.

[9] All subsequent references to the Wisconsin Statutes are to the 1997–98 text unless otherwise noted.

minimizing differences in the ability of school districts to raise revenue through property tax. Equalization aid compensates any deficiencies in a school district's tax base up to the guaranteed amount provided by the state. In other words, the equalization aid "make[s] up the difference between the district's actual tax base and the state['s] guaranteed tax base." *Elementary and Secondary Sch. Aids* at 7.

¶ 7. Computation of state equalization aid depends on five factors: a) membership, b) shared cost, c) equalized property valuation, d) guaranteed valuation, and e) the amount of available funding. *Elementary and Secondary Sch. Aids* at 7. The number of students enrolled in a district determines the district's membership. Wis. Stat. § 121.07(1)(a). Shared cost is the "sum of the net cost of the general fund and the net cost of the debt service fund." § 121.07(6)(a). Shared cost represents those school district expenditures for which the equalization formula provides aid. *Elementary and Secondary Sch. Aids* at 8. Equalized property valuation is "the full market value of taxable property in the school district as determined by the Department of Revenue (DOR). . .each year." *Id.* District equalized value (DEV) is the equalized valuation on a per pupil basis. *See Elementary and Secondary Sch. Aids* at 33. Guaranteed valuation represents a guaranteed tax base. *Id.* at 10. The state guaranteed valuation (SGV) is "the amount of property tax base support which the state guarantees behind each pupil." *Id.* at 8. *See also* § 121.07(7)–(8).

¶ 8. Equalization aid applies at three different district spending levels. District spending levels are defined in terms of shared cost. The first level consists of a primary guaranteed tax base of $2,000,000 per

pupil for the first $1,000 of shared costs.[10] Wis. Stat. § 121.07(6)(b), (c), and (7)(a). The $1,000 is also referred to as the primary cost ceiling. The Legislative Fiscal Bureau further explains:

> The first level is for shared costs up to the "primary cost ceiling" of $1,000 per member. The state's sharing of costs at the primary cost ceiling, referred to as "primary shared costs," is calculated using a statutory guaranteed valuation of $2,000,000 per member. State aid at the primary level is based on a comparison between a school district's equalized valuation per member and the primary guaranteed valuation; state aid will equal the amount of costs that would be funded by the missing portion of the guaranteed tax base. *Elementary and Secondary Sch. Aids* at 8.

Currently, all school districts in the state receive some primary equalization aid. The primary guarantee is protected by a hold harmless provision, which means that negative aids cannot reduce any district's primary aid amount. *See id.*

¶ 9. The state gives secondary equalization aid to a school district when the district spends at a level between the primary shared cost ceiling and the secondary cost ceiling. *Elementary and Secondary Sch. Aids* at 8. *See also* Wis. Stat. § 121.07(6)(d)1–2 and (dg). The 1998–99 secondary cost ceiling was $6,285. *Elementary and Secondary Sch. Aids* at 8. The amount of aid is

---

[10] A different primary guarantee applies to various types of school districts. The primary guarantee for a K–12 school district is $2,000,000. A union high school's primary guarantee is $6,000,000, and the primary guarantee for a K–8 school is $3,000,000. This opinion focuses on the primary guarantee for K–12 school districts because most districts are in that category. *Elementary and Secondary Sch. Aids* at 9.

determined by the ratio of a district's actual per-pupil equalized valuation to the secondary guaranteed valuation. The secondary guaranteed valuation is a variable amount. *Id.* In 1998–99 it was $676,977. *Id.*

¶ 10. The third level, or "tertiary shared cost" level, "is that portion of a school district's shared cost which is greater than the secondary ceiling cost per member multiplied by its membership." Wis. Stat. § 121.07(6)(dr). Before the legislature acted in 1995, the state employed a two-tiered system, which was replaced by the current three-tiered system under 1995 Wis. Act. 27. The amount of tertiary aid is deducted from the secondary aid amount if the amount of tertiary aid is a negative number. *Elementary and Secondary Sch. Aids* at 9. This is referred to as "negative aid." However, when the secondary and tertiary aid equal a negative number, the resulting amount is not deducted from the primary aid. *Id.* The tertiary guarantee is designed to discourage districts from spending at a level above the ceiling, and to narrow per pupil spending disparities. *Id.*

¶ 11. Applying these concepts, the amount of aid a district receives at any level may be determined by the following formula:

$$\textit{State aid = 1–DEV/SGV x shared cost}^{11}$$

The general equalization formula to determine the amount of aid a school district receives is:

---

[11] As defined in ¶ 7, "DEV" represents the district equalized value figure, and "SGV" represents the state guaranteed valuation figure.

*Equalization aid = (1–(DEV/primary SGV) x pri-*
*mary shared cost) +*

*(1–(DEV/secondary SGV) x secondary shared*
*cost) +*

*(1–(DEV/tertiary SGV) x tertiary shared cost)*

## CATEGORICAL AID

¶ 12. There are approximately 25 categorical aid programs.[12] The programs are either formula-driven, or they are grant programs. Formula-driven programs give funds to school districts on the basis of the number of students who meet the criteria for the program. *Elementary and Secondary Sch. Aids* at 14. Grant programs require districts to submit a proposal to receive funds. *Id.* Categorical aids differ from equalization aid in that they do not depend on the relative

---

[12] The following is a list of the state categorical aid programs: 1) handicapped education, 2) county children with disabilities education boards (CCDEBs), 3) pupil transportation, 4) school library, 5) TEACH technology block grants, 6) TEACH training and technical assistance grants, 7) telecommunications access program, 8) technology infrastructure loans, 9) pioneering partners grants, 10) bilingual-bicultural education, 11) aid to Milwaukee Public Schools (desegregation settlement aid), 12) preschool to grade 5 grants, 13) state tuition payments; open enrollment transfer payments, 14) full-time open enrollment aid for transportation, 15) alcohol and other drug abuse (AODA) grants, 16) head start supplement, 17) nutritional programs, 18) student achievement guarantee in education (SAGE), 19) driver education, 20) children-at-risk programs, 21) peer review and mentoring, 22) CESA administration, 23) environmental education, 24) alternative schools for American Indians, 25) youth options and open enrollment transportation. *Elementary and Secondary Sch. Aids* at 14–25.

wealth of a school district. *Id.* Categorical aids are not calculated into statutory revenue limits.

## THE SCHOOL LEVY TAX CREDIT

¶ 13. The school levy tax credit is paid to municipalities, in contrast to equalization aid and categorical aid, which are paid to school districts. *Elementary and Secondary Sch. Aids* at 1. *See also* Wis. Stat. §§ 20.835(3)(b), 79.10, 79.14. The tax credit is designed to reduce property taxes. *Id.* In 1998–99, on a statewide level, the school levy credit reduced the school portion of tax bills by 16.8% on average. *Elementary and Secondary Sch. Aids* at 29.

¶ 14. In addition to the school levy tax credit, district increases funded by local taxes are limited by a fixed amount, termed a "revenue limit." Wis. Stat. § 121.91. Revenue limits may only be exceeded if residents in a district pass a voter referendum. § 121.91(3). A school district may be penalized if the school district exceeds the maximum allowed revenue under § 121.91. § 121.92.

## B. Procedural History

¶ 15. We now turn to an examination of the procedural history of this case. The Plaintiffs initiated this action in October 1995. Thereafter, the president of the Wisconsin Education Association Council (WEAC) and other teachers ("the Intervening Plaintiffs") intervened. The Plaintiffs, Intervening Plaintiffs, and Defendants filed cross-motions for summary judgment on February 24, 1997.

¶ 16. The Petitioners[13] contend that the needs of Wisconsin students are changing and that the school finance system has not kept up with those needs. They contend that the perceived inequities in the system violate the uniformity clause and the Equal Protection Clause, contrary to the Wisconsin Constitution. The inequality stems from a failure "to adequately adjust for the disparity in tax base." (Pl.-Pet'r's Br. at 4.) As a result, property wealth dictates educational opportunity in this state, the Petitioners argue.

¶ 17. According to the Petitioners, categorical aids have been reduced, which "effectively restricts district spending by preventing the school board from compensating for the reduced state aid with additional property tax revenue." (Intervening Pl.-Pet'r's Br. at 12.) This results in school districts shifting funds away from regular programs and into categorical programs. As a result, some districts are unable to retain teaching positions or maintain school facilities. Other districts have cut their offerings in advanced placement or multiple foreign languages.

¶ 18. The Petitioners further contend that revenue limits prevent school districts from raising necessary funding. For instance, revenue limits prohibit school districts from purchasing and implementing new technology.

¶ 19. Moreover, the Petitioners argue that there has been a significant increase in "high need" students in Wisconsin. High need students include impover-

---

[13] We refer to the Plaintiffs and Intervening Plaintiffs collectively as "Petitioners," except when referring to the procedural history of this case. Throughout this opinion, we also identify specific arguments made by either the Plaintiffs or the Intervening Plaintiffs in their briefs as "Plaintiffs-Petitioners," or "Intervening Plaintiffs-Petitioners."

ished children, disabled children, and children with limited English skills. Additional programs have been mandated by either the state or the federal government for these high need students, but without necessarily increasing funding for the programs.

¶ 20. Finally, the Intervening Plaintiffs-Petitioners contend that charter schools and the Milwaukee Parental School Choice Program pull students out of the public schools. This in turn decreases the number of pupils, or members, in a school district, reducing the amount of funding the district receives.

¶ 21. The circuit court, the Honorable Richard J. Callaway presiding, found that under *Kukor*, 148 Wis. 2d 469, the school finance system is constitutional and granted the defendants' motion for summary judgment. The court first noted that all children in this state have an equal right to education. However, the Plaintiffs "mistakenly framed the issue as whether the State distributes its school money in a manner which equalizes local budgets rather than whether the children of Wisconsin. . .are receiving the education to which they are entitled." The court then concluded that the Plaintiffs and Intervening Plaintiffs had not overcome the strong presumption of constitutionality that statutes enjoy. *See, e.g., United States v. National Dairy Prod. Corp.*, 372 U.S. 29, 32 (1963).

¶ 22. The school finance system does not violate the uniformity clause of the constitution, the circuit court found, because according to this court's interpretation of the uniformity clause in *Kukor*, 148 Wis. 2d at 492 (Ceci, J. plurality); 148 Wis. 2d at 514 (Steinmetz, J., concurring), the constitution does not require that the educational opportunities provided by school districts be absolutely equal.

¶ 23. The circuit court also determined that the school finance system does not violate equal protection. The court repeatedly noted that the Plaintiffs and Intervening Plaintiffs failed to give virtually any evidence relating to the quality of education students receive in Wisconsin, and therefore, the court could not ascertain whether students are being deprived of their right to an education. The state has significantly increased its total state aid to the public schools, and the increase in state aid outweighs any disproportionate distribution of tax credit to wealthy property owners. The court further recognized that the current system provides schools across the board with more state aid than the system at issue in *Kukor*. The schools face the same problems that they did when the *Kukor* court reviewed the system, and the *Kukor* court was unpersuaded by those facts.

¶ 24. In sum, the circuit court concluded that the Plaintiffs and Intervening Plaintiffs did not demonstrate the school finance system's negative impact on education. Without such evidence, the court had no way to ascertain "the magnitude of any deficiencies in the State's effort to fulfill its duty to provide students with a basic education."

¶ 25. The court of appeals agreed that the plaintiffs did not demonstrate any material difference between the current system and the system at issue in *Kukor*. *Vincent*, slip op. at 6. In other words, no significant disparities exist between the aid given under either system. Slip op. at 28–29. Moreover, the court found no evidence of children who do not receive at least a basic education. Slip op. at 32–33. In fact, the court concluded, "the evidence suggests that the state is providing greater aid to school districts than it did at the time *Kukor* was decided." Slip op. at 33.

¶ 26. Judge Dykman concurred in the court of appeals' decision, but noted the record demonstrated "that lower spending school districts are laboring under very difficult conditions." *Vincent*, slip op. at 35 (Dykman, J., concurring). The concurrence also lamented that *Kukor* contained no test for the court of appeals to use in assessing the current finance system and that "substantially improved programs are needed in our less affluent school districts." Slip op. at 36.

¶ 27. In part II of this opinion we analyze art. X, § 3 in light of its constitutional history and this court's past precedent. We affirm *Kukor*, but explain further the *Kukor* definition of equal opportunity for an education. In parts III and IV we address whether the current school finance system violates art. X, § 3 and art. I, § 1 of the Wisconsin Constitution.

II

¶ 28. We begin by interpreting the uniformity clause in art. X, § 3 of the Wisconsin Constitution, which states that the district schools "shall be as nearly uniform as practicable."[14] We interpret constitutional provisions *de novo*. *Thompson v. Craney*, 199 Wis. 2d 674, 680, 546 N.W.2d 123 (1996). We benefit, however,

---

[14] Wisconsin Const. art. X, § 3—**District schools; tuition; sectarian instruction; released time**—states:

> The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years; and no sectarian instruction shall be allowed therein; but the legislature by law may, for the purpose of religious instruction outside the district schools, authorize the release of students during regular school hours.

from the analyses of the circuit court and the court of appeals.

¶ 29. We recognize that "the clear purpose of art. X, § 3, was to compel the exercise of the power to the extent designated." *Zweifel v. Joint Dist. No. 1, Belleville*, 76 Wis. 2d 648, 658, 251 N.W.2d 822 (1977). It is a "fundamental principle" that the Wisconsin Constitution limits legislative power. *Manitowoc v. Manitowoc Rapids*, 231 Wis. 94, 97, 285 N.W. 403 (1939). *See also State ex rel. Dudgeon v. Levitan*, 181 Wis. 326, 339, 193 N.W. 499 (1923); *Pauly v. Keebler*, 175 Wis. 428, 439, 185 N.W. 554 (1921); *Outagamie County v. Zuehlke*, 165 Wis. 32, 35, 161 N.W. 6 (1917). In *Buse v. Smith*, 74 Wis. 2d 550, 564, 247 N.W.2d 141 (1976), we specifically stated that "the search is not for a grant of power to the legislature but for a restriction thereon." Moreover, it is "a limitation upon the broad power of the state to educate its citizens through the establishment and operation of schools. The limitations are precisely stated: District schools, uniformity, and free tuition for certain ages." *Zweifel*, 76 Wis. 2d at 658. *See also Manitowoc*, 231 Wis. at 97–98; *Zuehlke*, 165 Wis. at 35.

¶ 30. Three sources guide our interpretation of a constitutional provision: "the plain meaning of the words in the context used; the constitutional debates and the practices in existence at the time of the writing of the constitution; and the earliest interpretation of the provision by the legislature as manifested in the first law passed following adoption." *Id.*

¶ 31. The word "uniform" in the context of art. X, § 3 plainly refers to the "character of instruction" provided in the public schools. In *T.B. Scott Lumber Co. v. Oneida County and another*, 72 Wis. 158, 161, 39 N.W. 343 (1888), this court found that the organization of a

township school system[15] did not violate the uniformity clause under art. X, § 3. By finding the township school system "uniform," this court implied that it did not equate equal acreage with "uniformity." Suzanne M. Steinke, *The Exception to the Rule: Wisconsin's Fundamental Right to Education and Public School Financing*, 1995 Wis. L. Rev. 1387, 1399 [hereinafter, *The Exception to the Rule*]. Later, in *State ex rel. Zilisch v. Auer*, 197 Wis. 284, 290, 221 N.W. 860 (1928), we determined that the uniformity clause in art. X, § 3 related to the "character of instruction" at the public schools after they were established, not the "method of forming school districts," or fixing district boundaries. "Character of instruction" was described as "the training that these schools should give to the future citizens of Wisconsin." *Id*. These representative cases demonstrate that from our earliest jurisprudence on, we have construed the uniformity clause to relate to the "character of instruction" offered in the public schools, and not the size, boundaries, or composition of the school districts. *See also The Exception to the Rule*, 1995 Wis. L. Rev. at 1400.

¶ 32. The practices in existence around the time of the constitutional conventions further guide our interpretation of Wis. Const. art. X, § 3. Before the mid–1800's, elementary and secondary schools were generally privately funded. Erik LeRoy, *The Egalitarian Roots of the Education Article of the Wisconsin Constitution: Old History, New Interpretation, Busé v. Smith Criticized, 1981 Wis. L. Rev. 1325, 1344 [hereinafter, Egalitarian Roots]. See also The Exception to the*

---

[15] A township school system was organized and taxed through a town. Patzer, *Public Education in Wisconsin* at 63. Under this system, independent school districts became subdistricts of the greater township school unit. *Id*.

*Rule, 1995 Wis. L. Rev. at 1391. The territorial govern-
ment in 1836 created a "district school" system that was
financed partially by taxes, but still in large part by
private subscription. Egalitarian Roots, 1981 Wis. L.
Rev. at 1344–45.*

¶ 33. Several factors produced an "impetus" for
free public school education in Wisconsin. *Egalitarian
Roots*, 1981 Wis. L. Rev. at 1347. First, some viewed
public schools as an opportunity to eliminate distinc-
tions between the wealthy and the poor.[16] *Id.* at 1346.
Others viewed public schools as a way to integrate the
swell of new immigrants with East Coast "trans-
plants." *Id.* at 1347. Finally, others simply wanted to
use state funds to "to pay for education." *Id.* at 1348.

¶ 34. It appears that by the time of the 1846 con-
stitutional convention, there was general support for a
constitutional provision on education. *Egalitarian
Roots*, 1981 Wis. L. Rev. at 1348 and n.101. The 1846
constitutional convention manifested its support for
education by devoting 500,000 acres of land, which the
federal government was to give to Wisconsin upon
attaining statehood. *Id.* at 1349. Unfortunately, how-
ever, no debates ensued relating to the draft of art. X,
§ 3 at either the 1846 or 1848 constitutional conven-
tions because the provision was wholly
uncontroversial. *Id.* at 1350.

¶ 35. Finally, we examine the early state stat-
utes on school finance. The state laws of 1848
contained a number of statutory provisions relating to
the public schools. The most comprehensive statute on
public schools included a detailed section on local

---

[16] The suffrage movement has also been credited with pro-
moting public education. *Egalitarian Roots*, 1981 Wis. L. Rev. at
1346 n.93.

taxes[17] and a section on the distribution of income of

[17] Laws of 1848—Of Taxes for School Purposes:

Sec. 90. It shall be the duty of the supervisors of the towns in this state to assess the taxes voted by every school district in their town, and also all other taxes provided in this chapter chargeable against such district or town upon the taxable property of the district or town respectively, and to place the same on the town assessment roll, in the column of school taxes and the same shall be collected and returned by the town treasurer in the same manner and for the same compensation as town taxes.

Sec. 91. The supervisors of each town shall assess upon the taxable property of said town a sum not less than one half of the amount received by said town from the school fund of this state, and the same shall be collected and returned in the same manner as is provided in the preceding section and shall be apportioned to the several school districts in the town in proportion to the number of children in each district between the ages of four and twenty years for the support of schools therein.

Sec. 92. The supervisors shall also assess upon the taxable property of their township two and a half mills on each dollar of the valuation thereof in each year which shall be apportioned to the several school districts in the townships for the support of schools therein, and the same shall be levied, callected [sic] and returned in the same manner as is provided in the preceding section.

Sec. 93. Each school district at any regularly called meeting of the legal voters of said district may raise an additional tax to defray the expenses of teachers wages and contingent expenses: and said tax shall be levied collected and returned as the town taxes provided for in this act: Provided, that when a tax shall be voted in any school district meeting, the notice for such meeting shall specify the object of raising such tax.

Sec. 94. The supervisors on delivery of the warrant for the collection of taxes to the town treasurer, shall also deliver to said treasurer a written statement of the amount of school taxes, the amount raised for district purposes on taxable property of each district in the town, the amount belonging to any new district on the division of the former district and the names of all persons having judgments assessed under the provisions of this chapter, upon the taxable property of any district with the amount payable to such person on account thereof.

Sec. 95. The town treasurer of each town shall retain in his hands out of the moneys collected by him the full amount of the

the school fund. "An Act in Relation to Public Schools," Laws of 1848, p. 240–41, 243. Significantly, Section 91 of the statute required each town receiving state funds to match at least half of the amount donated by the state. Section 92 set the property tax at "two and a half mills on each dollar." Section 93 provided for an additional tax that could be raised after a vote was taken to fund teachers' wages and expenses. The school fund provision stated that towns would receive interest from the school fund "in proportion to the number of children in such town. . . ." Section 104, Distribution of Income of the School Fund, Laws of 1848, p. 243.

■■

¶ 36. The plain meaning, the practices around the time of the constitutional convention, and the early statutes all indicate that art. X, § 3 was intended to refer to the character of the instruction given at the public schools.

¶ 37. We now turn to this court's more recent precedent regarding school finance. This court has directly examined the constitutionality of the state school finance system twice in the last 25 years. At issue in *Buse*, 74 Wis. 2d at 556, were two statutes that created negative aid for certain school districts, or reduced the positive aid those districts could have received. The plaintiffs, the negative aid school districts and property taxpayers residing in the negative aid school districts, argued that the negative aid statutes were unconstitutional. Their main argument was

school tax collected on the assessment roll, and hold the same subject to the order of the district treasurer. ·

Sec. 96. Said treasurer shall from time to time apply to the county treasurer for all school moneys belonging to his town or the districts thereof, and on the receipt of the moneys to be apportioned to the districts, he shall notify the town clerk of the amount to be apportioned.

that the statutory negative aid provisions violated the rule of uniform taxation, articulated in art. VIII, § 1 of the Wisconsin Constitution. *Buse*, 74 Wis. 2d at 554. Additionally, the court addressed whether negative aid was unconstitutional under art. X, §§ 3 and 4 and art. I, § 1 of the Wisconsin Constitution. *Id.* at 562.

¶ 38. The court first examined whether the statutes violated the uniformity clause of Wis. Const. art. X, § 3. The court specifically considered whether art. X, § 3 requires the legislature "to provide an equal opportunity for education for all school children in the state." *Buse*, 74 Wis. 2d at 562. The court recognized that while the United States Constitution does not require the establishment of schools, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973), the Wisconsin Constitution does contain that requirement. *Buse*, 74 Wis. 2d at 564 (quoting Wis. Const. art. X, § 3). Besides establishing the public schools, art. X, § 3 also states that the public schools must be "as nearly uniform as practicable" and that children in the state may attend the public schools without charge. *Id.* at 565.

¶ 39. Having set forth the pertinent constitutional provisions, the court held the framers of the constitution intended the phrase "as nearly uniform as practicable" to refer to the "character of instruction" at the district schools. *Id.* at 566 (quoting *State ex rel. Zilisch v. Auer*, 197 Wis. 284, 289–90, 221 N.W. 860, 223 N.W. 123 (1928)). The court further stated that "[e]quality of opportunity for education is equated with the right of all school children to attend a public school free of charge. . .," *id.* at 565, and equal opportunity for education is a fundamental right. *Id.* at 567. However, the court concluded that according to the plain meaning of art. X, § 3 and constitutional history, art. X, § 3

does not require educational opportunity to be absolutely uniform. *Id.* at 568.

¶ 40. With regard to art. X, § 4 of the Wisconsin Constitution, the court examined whether local district control of funding was, in some measure, required by the constitution. *Buse,* 74 Wis. 2d at 570. The court again carefully examined the language of the constitution, the constitutional debates, and the early legislative enactments to determine that "[l]ocal districts retain the control to provide educational opportunities over and above those required by the state and they retain the power to raise and spend revenue '. . .for the support of common schools therein. . . . ' " *Id.* at 570–72.

¶ 41. The court then found the negative aid provisions unconstitutional in light of the uniform tax rule in art. VIII, § 1 of the Wisconsin Constitution. The court set forth the limitations on the power to tax, noting that "the purpose of [a] tax must be one which pertains to the public purpose of the district within which the tax is to be levied and raised." *Id.* at 577. The state does not have the power to tax a local entity " 'for a purely local purpose.' " *Id.* at 576 (quoting Thomas M. Cooley, *Law of Taxation,* § 86, pp. 211, 212 (1924)). As such, the court concluded, "the state cannot compel one school district to levy and collect a tax for the direct benefit of other school districts, or for the sole benefit of the state." *Id.* at 579.

¶ 42. Finally, the court examined whether the negative aid provisions violated equal protection and due process. Because the court held that equal educational opportunity is a fundamental right, the court applied the strict scrutiny test to its equal protection analysis. *Id.* at 580. The court then concluded that the negative aid provisions survived strict scrutiny. *Id.*

¶ 43. The concurrence viewed negative aid as a state tax. *Buse*, 74 Wis. 2d at 581 (Robert W. Hansen, J., concurring). However, the concurrence agreed with the majority that a municipality cannot be forced to assume obligations that it does not ordinarily have. *Id.* (quoting *Lund v. Chippewa County*, 93 Wis. 640, 648–49, 67 N.W. 927 (1896)).

¶ 44. The dissent disagreed that negative aid violated the uniform taxation rule. *Buse*, 74 Wis. 2d at 583 (Abrahamson, J., dissenting). The dissent first noted that it felt the majority had not "accorded this statute the proper presumption of constitutionality." *Id.* at 584. Moreover, the dissent argued it was "not clear beyond reasonable question that the statute conflicts with the constitution," and when in doubt, a court must " 'favor. . .the validity of the act.' " *Id.* (quoting *State ex rel. New Richmond v. Davidson*, 114 Wis. 563, 579–80, 88 N.W. 596, 90 N.W. 1067 (1902)).

¶ 45. The dissent articulated the issue before the court as "whether the 'negative aid' statute violates the public purpose doctrine. . . ." *Buse*, 74 Wis. 2d at 589. The dissent found that negative aid "applies across the state to all school districts," and "[n]o one school district is singled out to support another school district or state education." *Id.* at 594. Moreover, the dissent felt that negative aid should not be invalidated just because some, but not all, districts have to pay it. *Id.* The dissent concluded that the negative aid provisions were consistent with precedent. *Id.* at 594–95.

¶ 46. More recently, in *Kukor v. Grover*, the plurality and concurrence agreed that under art. X, § 3 of the Wisconsin Constitution each student is guaranteed a basic education.[18] 148 Wis. 2d at 503 (Ceci, J., plural-

[18] We have adopted the United States Supreme Court's treatment of plurality opinions in applying the holdings of that

620

ity); *id.* at 514 (Steinmetz, J., concurring). The plurality and concurrence further agreed that education does not have to be absolutely uniform to satisfy art. X, § 3.[19] *Id.* at 487 (Ceci, J., plurality); *id.* at 514 (Steinmetz, J., concurring). Second, the plurality and concurrence held that the legislature's fiscal decisions regarding education are entitled to great deference. *Id.* at 502–03 (Ceci, J., plurality); *id.* at 512 (Steinmetz, J., concurring). Third, the plurality and concurrence held that it is not necessary to analyze the school funding system under strict scrutiny, because equal allocation of state resources is not a fundamental right.[20] *Id.* at 498 (Ceci, J., plurality); *id.* at 513 (Steinmetz, J., concurring).

¶ 47. The dissent characterized the state school finance system as "fundamentally flawed" because the state, according to the dissent, did not take educational need into account when distributing funds. *Kukor,* 148 Wis. 2d at 516 (Bablitch, J., dissenting). The dissent

---

Court. *Lounge Management v. Town of Trenton,* 219 Wis. 2d 13, 21–22, 580 N.W.2d 156 (1998); *Tomczak v. Bailey,* 218 Wis. 2d 245, 284, 578 N.W.2d 166 (1998) (Crooks, J., concurring). In a plurality " 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " *Id.* (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n.15 [ ] (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). *See also Marks v. United States,* 430 U.S. 188, 193 (1977).

[19] We also note that the plurality viewed the "character of instruction" that must be uniform as the standards set forth in Wis. Stat. § 121.02, such as "minimum standards for teacher certification, minimal number of school days, and standard school curriculum." *Kukor v. Grover,* 148 Wis. 2d 469, 492–93, 436 N.W.2d 568 (1989).

[20] However, the court recognized that equal access to education is a fundamental right. *Kukor,* 148 Wis. 2d at 496.

621

noted that "character of instruction" had been defined by this court as " 'services, procedures, opportunities or rules' provided in district schools." *Id.* at 520 (quoting *Zweifel v. Joint Dist. No. 1, Belleville*, 76 Wis. 2d 648, 653, 251 N.W.2d 822 (1977)). The dissent then pointed to the circuit court's findings, which indicated the failure of the school finance system. *Id.* at 522–24. In particular, the dissent criticized the finance system's method of funding "special needs" programs, leaving school districts with little choice but to draw funds from "regular" programs to be used for "special needs." *Id.* at 525. The dissent felt that the evidence demonstrated the finance system's failure to provide children with "a uniform opportunity to become an educated person." *Id.* at 526.

¶ 48. Our decision in *Kukor* laid the foundation for the right that we explain today. Recently, a number of states considering the constitutionality of school finance systems have turned toward the notion of educational adequacy as a better approach than previous educational equality analyses. *See, e.g., McDuffy v. Secretary of the Executive Office of Educ. and others*, 615 N.E.2d 516, 554 (Mass. 1993) (quoting *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989)); *Pauley v. Kelly*, 255 S.E.2d 859, 877 (W. Va. 1979). The adequacy approach to school finance refers to an examination of "the quality of the educational services delivered to children in disadvantaged districts. . . ." Peter Enrich, *Leaving Equality Behind: New Directions in School Finance Reform*, 48 Vand. L. Rev. 101, 109 (1995) [hereinafter, *Leaving Equality Behind*].

¶ 49. Courts have turned toward adequacy as an alternative way to analyze school finance systems because previous decisions centered on equality have

not lessened the disparity between school districts. *Leaving Equality Behind*, 48 Vand. L. Rev. at 102–03. Focusing on adequacy, it is claimed, has a number of benefits. Among other benefits, the adequacy approach is "grounded in broadly shared societal values concerning the importance of education and the obligation to provide for the basic needs of society's least advantaged." *Id.* at 170. The adequacy approach also may be appealing because it does not threaten to lower the level of achievement in some districts in an effort to create equality. *Id.*

¶ 50.　Under the adequacy approach, a state generally lists the types of knowledge that a child should possess to guide a legislature in fulfilling its constitutional obligations. For example, Massachusetts articulated the following guidelines:

> An educated child must possess "at least the seven following capabilities: (i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable students to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient level of academic or vocational skills to enable public school students to compete favorably with

their counterparts in surrounding states, in academics or in the job market."

*McDuffy*, 615 N.E.2d at 554 (quoting *Rose*, 790 S.W.2d at 212). This type of standard articulates the content of an adequate education. *Leaving Equality Behind*, 48 Vand. L. Rev. at 176. Courts that have used this approach do not attempt to "displace the legislative function of identifying realistic parameters for the state's ambitions, but rather [attempt] to serve as a goad or as a backstop to the legislature's accomplishment of that task." *Id.* In Massachusetts, it was expected that limited judicial intervention would likely be "quite productive." *Id.*

¶ 51. An equal opportunity for a sound basic education is one that will equip students for their roles as citizens and enable them to succeed economically and personally. The legislature has articulated a standard for equal opportunity for a sound basic education in Wis. Stat. §§ 118.30(1g)(a) and 121.02(L). Section 118.30(1g)(a) states that "each school board shall adopt pupil academic standards in mathematics, science, reading and writing, geography and history." Section 121.02(L) requires that "each school board shall. . .provide instruction" in several subjects, according to school grades.

¶ 52. By grounding the standard in statutes, we reiterate our position in *Kukor*, 148 Wis. 2d at 503, 505 n.14, wherein we stated that we defer to the legislature because it "is uniquely equipped to evaluate and respond to such questions of public policy. . . ." As such, we defer here to the legislature's wisdom in choosing

which core subjects[21] should be involved in providing an equal opportunity for a sound basic education.[22]

¶ 53. Further, we note that the reason for articulating the standard in terms of equality and adequacy is to guarantee "that each district can provide its students with an acceptable basic level of educational services." *Leaving Equality Behind*, 48 Vand. L. Rev. at 112. The objective is to adopt a standard that will "equaliz[e] outcomes, not merely inputs." *Id.* at 151.

## III

■■■■

¶ 54. We now consider the Petitioners' argument that the statutory school finance system set forth in Wis. Stat. ch. 121, and Wis. Stat. §§ 79.10 and 79.14, lacks uniformity under art. X, § 3 of the Wisconsin Constitution. A party challenging a statute must prove that the statute is unconstitutional beyond a reasonable doubt. *Norquist v. Zeuske*, 211 Wis. 2d 241, 250, 564

---

[21] The opportunity to be proficient in these core subjects must be as equal as practicable; the performance on proficiency tests is not expected to be equal. This means that poor student performance on proficiency tests in school districts is not, without much more, an indicia of the unconstitutionality of the state school finance system.

[22] Wisconsin Stat. § 118.30 (1997–98) was the result of a coordinated effort on the part of both the executive and legislative branches of Wisconsin state government. For instance, the state superintendent is responsible for general pupil assessments given in the 4th, 8th, and 10th grade, § 118.30(1)(a), and the department must develop a high school graduation examination based on pupil academic standards if academic standards are issued by the governor. § 118.30(1)(b). In accepting and applying the standard set forth today, this court is cognizant of its role, and the respective roles of the other co-equal branches of government in Wisconsin.

N.W.2d 748 (1997). "Constitutional challenges to a statute must overcome a strong presumption of constitutionality," and the presumption of constitutionality is greatest for tax statutes. *Id.* We make every effort to construe a statute consistent with the constitution. *Id.* We conclude the Petitioners have not proved beyond a reasonable doubt that the statutory school finance system violates art. X, § 3. The state adequately funds each school district to provide for a basic education, and any disparity between districts is a result of district revenue-raising capacity above the state's guaranteed tax base. The right to an equal opportunity for a sound basic education has not been shown to be violated by the present school finance system.

¶ 55. We begin by briefly summarizing the Petitioners' arguments relating to their challenge under art. X, § 3 of the Wisconsin Constitution. Both the Plaintiffs-Petitioners and the Intervening Plaintiffs-Petitioners argue that the school finance system fails because, they contend, the state does not equalize financial resources between school districts. (Pl.-Pet'r's Br. at 41; Intervening Pl.-Pet'r's Br. at 33.) The Plaintiffs-Petitioners specifically argue that the Legislature should "eliminate the tax base disparities from the system so districts that tax the same (at whatever level they choose), spend the same." (Pl.-Pet'r's Br. at 71.)

¶ 56. The Intervening Plaintiffs-Petitioners argue that the state should create a school finance system that "recognizes, rather than ignores, differing needs of both property-poor districts and high needs students." (Intervening Pl.-Pet'r's Br. at 34.) Essentially, the Intervening Plaintiffs-Petitioners would like the state school financing system to adjust the financial resources distributed to school districts to take into account the cost of educating high need students.

(Intervening Pl.-Pet'r's Br. at 35.) The Intervening Plaintiffs-Petitioners also would like the state to formulate objective standards to measure whether students are receiving at least a basic education. (Intervening Pl.-Pet'r's Br. at 34.)

¶ 57. Historically, this court has held that disparity in the revenue-raising capacity of a school district does not constitute a violation of the uniformity clause. As we stated earlier, in *Zilisch*, 197 Wis. at 289, we considered whether the phrase, "as nearly uniform as practicable," referred to the method of establishing school districts, or to maintaining schools after the districts were established. The court looked to the language of art. X, § 3, which refers to "the establishment of district schools," for guidance. *Id.* This language revealed that the framers applied the uniformity clause to the schools themselves, not to the creation of the school districts. *Id.* at 290. The court explained that the provision spoke to "the character of instruction that should be given in those schools after the districts were formed,—with the training that these schools should give to the future citizens of Wisconsin." *Id.*

¶ 58. Similarly, in *Larson v. State Appeal Bd.*, 56 Wis. 2d 823, 827–28, 202 N.W.2d 920 (1973), this court again held that art. X, § 3 of the Wisconsin Constitution applies to the "character of instruction" in schools, not the nature of the boundaries between school districts. The appellant in *Larson* set forth evidence relating to the equalized valuations, the number of students, and the size of the Watertown and Johnson Creek school districts. *Id.* at 826–27. The court refused to apply an analysis under Wis. Const. art. X, § 3 because the court found that those facts did not pertain to the character of instruction in the districts. *Id.* at

627

828. *Larson* reaffirmed that this court does not review the composition of school districts under the guise of an art. X, § 3 analysis.

¶ 59. We find this conclusion to be very significant. The Petitioners argue that some school districts have low property values and therefore cannot raise as much local revenue as other districts. However, according to a careful reading of *Zilisch*, the constitution does not require districts to have uniform revenue-raising capacity. The *Zilisch* court stated that districts are not required to have uniform boundaries, or to be established in a uniform manner. *Zilisch*, 197 Wis. at 290. *See also Joint Sch. Dist. v. Sosalla*, 3 Wis. 2d 410, 420, 88 N.W.2d 357 (1958). If the framers of the state constitution did not intend the districts' boundaries or method of establishment to be uniform, then surely the framers could not have envisioned the districts' taxing capacity to be uniform, since taxing ability and boundaries are interrelated.

¶ 60. Moreover, the constitution only requires that each child receive an equal opportunity for a sound basic education. *Busé* recognized that children have a fundamental right to an "equal opportunity for education." *See Busé*, 74 Wis. 2d at 567. We have repeatedly stated this proposition, both before and after our pronouncement in *Busé*.

¶ 61. First, in *State ex rel. Comstock v. Joint Sch. Dist.*, 65 Wis. 631, 636–37, 27 N.W. 829 (1886), we stated that "when the legislature has provided for each such child the privileges of a district school, which he or she may freely enjoy, the constitutional requirement in that behalf is complied with." Later, in *Davis v. Grover*, 166 Wis. 2d 501, 539, 480 N.W.2d 460 (1992), we held:

"[t]he uniformity clause clearly was intended to assure certain minimal educational opportunities for the children of Wisconsin. . . . [T]he uniformity clause requires the legislature to provide the opportunity for all children in Wisconsin to receive a free uniform basic education." In *Jackson v. Benson*, 218 Wis. 2d 835, 894–95, 578 N.W.2d 602 (1998), this court most recently recognized that "art. X, § 3 provides not a ceiling but a floor upon which the legislature can build additional opportunities. . . ."

¶ 62. A review of other provisions in art. X of the Wisconsin Constitution is further helpful in ascertaining the framers' intent in drafting art. X, § 3. Article X, § 5 is the one constitutional provision that allocates state funds for the public school districts. It states that income from the school fund is to be distributed "in some just proportion to the number of children and youth resident therein between the ages of four and twenty years. . . ." This provision articulates the extent of the state's funding obligation to the school districts: to provide funding on a per-pupil basis. The plain meaning of the provision supports this view—the framers phrased their directions in purely mathematical terms such as "proportion" and "number." The provision does not include language from which we could infer that certain children were to be allocated more funding than others based on subjective need alone.

¶ 63. An analysis of Wis. Const. art. X, § 4 further supports our conclusion. Article X, § 4 requires towns and cities to raise a tax to support the schools located within that area. Wis. Const. art. X, § 4. In *Busé*, 74 Wis. 2d at 571, we recognized the importance of local control under art. X, § 4. We quoted Experience Estabrook, the Chairman of the Constitutional Committee on Education and School Funds during the

second Wisconsin Constitutional Convention, who argued that local funds should support local schools so that all citizens, wealthy or poor, would have an "adequate interest" in their public schools. We find his language worth repeating:

> If a sufficient sum was not contributed by the school fund, the towns should have power to raise more. This provision was directly for the advantage of the poor. . . . [A] poor man with a family of children, and no fancy lots to dispose of, could understand the advantage. Experience had shown that if nothing was contributed by the town, the common schools languished, and select schools rose on their ruins. The school fund of Connecticut was so large as to be sufficient to defray the expenses of the education of every child within the limits of the state. Yet there, until a year or two, the district school-system had declined. No adequate interest was felt by the people, in common schools, unless they contributed to their support. To obviate this danger, the committee had inserted the section.

*Buse*, 74 Wis. 2d at 570–71 (quoting Experience Estabrook, *Journal and Debates Constitutional Convention 1847–48*, p. 335). Estabrook's comments on art. X, § 4 demonstrate that above the constitutionally mandated state per-pupil expenditures, the framers intended local government to contribute a significant amount to school districts. More importantly, Estabrook's comments suggest that local school districts may vary in the amount they tax and spend on their districts.

¶ 64. Other jurisdictions have also upheld their school finance systems on the basis that the state provided for a basic level of education. The Minnesota Supreme Court recently interpreted the phrase, "general and uniform system of public schools," contained

630

in the education clause of the Minnesota Constitution, and found that it did not mean " 'identical' " or " 'nearly identical.' " *Skeen v. State*, 505 N.W.2d 299, 302, 311 (Minn. 1993). The Minnesota school finance system was constitutional, the court determined, because the evidence did not establish "that the basic system is inadequate or that the 'general and uniform' requirement somehow implies full equalization of local referendum levies." *Id.* at 312. The court further stated that the inequities in the system did not "rise to the level of a constitutional violation." *Id.* Most significantly, the court recognized that the system was constitutional because it continued to "meet the basic educational needs of all districts." *Id.*

¶ 65. The Virginia Supreme Court, in examining the education article of the Virginia Constitution, held that it does not require " 'substantial equality' in spending or programs among or within the school divisions in the Commonwealth." *Scott v. Commonwealth*, 443 S.E.2d 138, 142 (Va. 1994).

¶ 66. Other courts have examined whether the state funds each district enough to fulfill state minimum requirements. The Oregon Supreme Court found compliance under the language of the Oregon Constitution "if the state requires and provides for a minimum of educational opportunities in the district and permits the districts to exercise local control over what they desire, and can furnish, over the minimum." *Olsen v. State*, 554 P.2d 139, 148 (Or. 1976). Noting that it did not necessarily find the school finance system "desirable," the court nevertheless held that the system was constitutional.

¶ 67. Further, the Colorado Supreme Court cautioned that the uniformity provision in the Education Clause of the Colorado Constitution did "not prevent a

local school district from providing additional educational opportunities beyond" the constitutional standard. *Lujan v. Colorado State Bd. of Educ.*, 649 P.2d 1005, 1025 (Colo. 1982). Moreover, the court held that the uniformity provision did not require identical per-pupil expenditures among school districts. *Id.*

¶ 68. The cases from other jurisdictions support our conclusion that the uniformity clause under Wis. Const. art. X, § 3 does not require absolute uniformity in either educational offerings or per-pupil expenditures among school districts. The cases cited above also demonstrate that a school finance system that uniformly funds school districts to provide a basic level of education is constitutional.

¶ 69. We now turn to the evidence presented in this case. The legislature is entitled to deference in its "legislative policy involving fiscal-educational decisions." *Kukor*, 148 Wis. 2d at 503 (quoting *Busé*, 74 Wis. 2d at 566). In *Busé*, 74 Wis. 2d at 566, we explained that the legislature "determine[s] what uniformity [is] 'practicable.' " We uphold a circuit court's findings of evidentiary or historical fact unless they are clearly erroneous. *Treiber v. Knoll*, 135 Wis. 2d 58, 64, 398 N.W.2d 756 (1987). The Petitioners made a voluminous record, submitting numerous affidavits, depositions, and other materials. We have carefully perused the record made by the Petitioners, and yet we cannot conclude that they have proved the school finance system is unconstitutional beyond a reasonable doubt.

¶ 70. The Plaintiffs-Petitioners attempt to demonstrate that some districts "are able to provide more opportunities" in their course offerings and technology than other districts. (Pl.-Pet'r's Br. at 50,

quoting Deputy State Superintendent Steven Dold's deposition). They also attempt to demonstrate that some districts maintain better facilities, textbooks, and a larger teaching staff. Finally, they attempt to provide statistical and financial evidence showing differences in equalized valuations between districts. They then cite to case law from Arizona, Ohio, and Vermont, invalidating school finance systems based on financial differences among the school districts in those states. *Roosevelt Elementary Sch. Dist. Number 66 v. Bishop*, 877 P.2d 806 (Ariz. 1994); *DeRolph v. State of Ohio*, 677 N.E.2d 733 (Ohio 1997) (plurality opinion); *Brigham v. State of Vermont*, 692 A.2d 384 (Vt. 1997).

¶ 71. The Petitioners' evidence, however meticulously gathered, fails to demonstrate that any children lack a basic education in any school district. Merely showing disparity of the financial resources among school districts is not enough in this state to prove a lack of equal opportunity for a sound basic education. As we have discussed above, Wisconsin requires districts to fulfil a constitutional minimum educational offering, not a maximum.

¶ 72. While we recognize that the Petitioners have gathered qualitative evidence pertaining to the deteriorating school facilities, limited curricula, and lack of computer technology of some "property poor" school districts, we agree with the Respondents that evidence of the elimination or reduction of certain advanced or elective courses from some districts does not mean that those school districts fail to offer a basic education. (Resp't's Br. at 71–72.) We also strongly agree with the circuit court that the evidence fails to show that the actual basic education being received by the students attending these school districts is inferior to that of the students in the "property rich" school

districts. There is no evidence, as the circuit court noted, of poor standardized test scores, college entrance rates, or the like. As we have stated, what is required is an equal opportunity for a sound basic education.

¶ 73. Moreover, the present school finance system more effectively equalizes the tax base among districts than the system did at the time *Kukor* was decided. At the time of the *Kukor* decision, the system had only two levels of shared cost. *Kukor*, 148 Wis. 2d at 476–77. The present system now includes a tertiary level of shared cost. The effect of the tertiary level of shared cost has been to redistribute funds to districts spending less, which are those with lower property values. As such, the present system does more to equalize values between districts than the system found constitutional in *Kukor* did.

¶ 74. State funding has also significantly increased.[23] *Kukor* was based on figures compiled for the 1985–86 school year. *Kukor*, 148 Wis. 2d at 475 nn.1–2. In 1985–86, the state distributed approximately $1.142 billion in state aid. *Kukor*, 148 Wis. 2d at n.2 (citing Basic Facts (1986–87), Wisconsin Depart-

[23] We also note that the state appears to fund "poor" school districts much more than it funds "wealthy" districts. The circuit court cited some excellent comparisons of the amount of state aid per pupil given to "wealthy" and "poor" school districts. For instance, according to the equalization aid estimate for 1996–97, Mequon-Thiensville (a "wealthy" district) received $724.61 in equalization aid, which was 10.6% of its $6,840.53 costs per pupil. In comparison, Antigo (a "poor" district) received $4,642.05 in equalization aid, which was 77.2% of its $6,014.20 costs per pupil. This is but one example of the more substantial state aid given to "poor" districts than to "wealthy" districts.

ment of Public Instruction at A–6, A–7). By 1997–98, in comparison, the state appropriated approximately $3.804 billion. *Elementary and Secondary Sch. Aids* at 4, Table 3. Between 1987 and 1998, state aid increased by at least 4.9% every fiscal year, and often much more. *Id.* For instance, from the 1995–96 fiscal year to the 1996–97 fiscal year, state aid increased by 31.8%.[24] *Id.* In contrast, the Consumer Price Index only reflected increases between 2.3% and 5.4% per year. *Id.*

¶ 75. The Petitioners also contend that the statutory revenue limits are unconstitutional under art. X, § 3. In particular, the Intervening Plaintiffs-Petitioners argue that revenue limits most severely affect school districts with decreasing student populations, or those with many high needs students. (Intervening Pl.-Pet'r's Br. at 47.)

¶ 76. We do not agree that revenue limits adversely affect the constitutionality of the school finance system. Revenue limits were included in the 1848 statutes, as we noted earlier. Revenue limits do not absolutely bar school districts from increased spending—they merely require a voter referendum to do so. Moreover, Wis. Stat. § 121.91(4)(f) and (6), as created by 1997 Wis. Act 27, §§ 2902v and 2903g, minimize the impact of revenue limits on school districts with declining enrollments by adjusting the method for counting pupils. Finally, revenue limits were intended to provide property tax relief, and actually have an equalizing effect, because districts that spend less can increase their spending by a greater percentage without first seeking a referendum.

¶ 77. Finally, we note that the cases cited by the Plaintiffs-Petitioners are distinguishable on the facts.

---

[24] The state is now committed to funding two-thirds of the school districts' cost of education. 1997 Wis. Act 27.

*Brigham* is distinguishable because the Vermont Constitution does not contain a provision requiring local funding of school districts. *Brigham*, 692 A.2d at 392. In *DeRolph*, 677 N.E.2d at 742–745, the Ohio Supreme Court concluded that many districts in the Ohio public school system were wholly unable to provide the basic resources necessary to educate the students, and therefore, the finance system was in violation of the Ohio Constitution. This is not the case in Wisconsin where the basic resources are being provided. The school finance system at issue in *Roosevelt* relied heavily on local property taxation and "only partial attempts at equalization." *Roosevelt*, 877 P.2d at 815. Again, the state funds two-thirds of the school districts' expenditures in Wisconsin and employs three levels of equalization aid. Certainly, this is not heavy reliance on local property taxation or a half-hearted attempt at equalization.

¶ 78. In sum, we conclude the Petitioners have not proved beyond a reasonable doubt that the statutory school finance system violates art. X, § 3. The state adequately funds each school district to provide for a basic education, and any disparity between districts is a result of district revenue-raising capacity above the state's guaranteed tax base. The right to an equal opportunity for a sound basic education has not been shown to be violated by the current school finance system.

## IV

¶ 79. We now address whether the current school finance system violates equal protection under art. I,

§ 1 of the Wisconsin Constitution.[25] First, we must determine whether to apply a strict scrutiny review or a rational basis review. The Petitioners urge us to apply a strict scrutiny standard of review.

¶ 80. Equal protection guarantees the "right to be free from invidious discrimination in statutory classifications and other governmental activity."[26] *Jackson*, 218 Wis. 2d at 901 (quoting *Harris v. McRae*, 448 U.S. 297, 322 (1980)). We apply a strict scrutiny review of a statute when the legislative classification interferes with a fundamental right or is created on the basis of a suspect criterion. *State v. Annala*, 168 Wis. 2d 453, 468, 484 N.W.2d 138 (1992). If a fundamental right or a suspect class is not involved, then a court reviews whether the statute's classification "rationally furthers a purpose identified by the legislature." *Id.* Fundamental rights are based on the Constitution either explicitly or implicitly. *State v. Martin*, 191 Wis. 2d 646, 652, 530 N.W.2d 420 (Ct. App. 1995) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33 (1973)).

---

[25] Article I, § 1 of the Wisconsin Constitution states:

All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed.

[26] We treat the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and the Wisconsin Constitution as equivalent. *Jackson v. Benson*, 218 Wis. 2d 835, 900–01 n.28, 578 N.W.2d 602 (1998). As such, we refer to cases analyzing either the Fourteenth Amendment or art. I, § 1 of the Wisconsin Constitution.

¶ 81. We acknowledge that Wisconsin children have a fundamental right to an equal opportunity for a sound basic education, and that right is based on art. X, § 3 of the Wisconsin Constitution.[27] *Kukor*, 148 Wis. 2d at 496 (quoting *Busé*, 74 Wis. 2d at 567). However, in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 24 (1973), *reh'g denied*, 411 U.S. 959 (1973), the United States Supreme Court held that the Equal Protection Clause does not require "absolute equality or precisely equal advantages" on the basis of wealth. We also have stated that while the right to an equal opportunity for education is fundamental in Wisconsin, absolute equality in per-pupil expenditures is not mandated. *Kukor*, 148 Wis. 2d at 496.

¶ 82. The Petitioners argue that we should review their equal protection claim relating to financial disparities between districts under strict scrutiny. They argue that since this court has recognized the equal opportunity for education as a fundamental right, strict scrutiny applies.

¶ 83. We carefully distinguish between the fundamental right to an equal opportunity for a sound basic education under art. X, § 3 and the wealth-based arguments the Petitioners make. In other words, the fundamental right to an equal opportunity for a sound basic education does not rest on any classification based on wealth. In *Kukor* we addressed a similar argument. Citing *Rodriguez*, we concluded that a rational basis standard should be applied "because the rights at issue in the case before the court are premised

---

[27] We note that children do not have a fundamental right to an education under the United States Constitution. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973).

upon spending disparities and not upon a complete denial of educational opportunity within the scope of art. X."[28] *Kukor*, 148 Wis. 2d at 498. *See also Skeen*, 505 N.W.2d at 316–17 (citing our approach in *Kukor* with approval). Since the Petitioners' argument rests on wealth-based classifications and not classifications based on art. X, § 3, we apply the rational basis test.

¶ 84. Under the rational basis test, we give great deference to legislative classifications. *Tomczak v. Bailey*, 218 Wis. 2d 245, 264, 578 N.W.2d 166 (1998). We must " 'locate or. . .construct, if possible, a rationale that might have influenced the legislature and that reasonably upholds the legislative determination.' " *Id.* (quoting *Sambs v. City of Brookfield*, 97 Wis. 2d 356, 371, 293 N.W.2d 504 (1980)).

¶ 85. The legislative classifications set forth in Wis. Stat. ch. 121 are rationally related to the purpose of educating Wisconsin's children. The school financing system provides all school districts with a guaranteed tax base. Moreover, the three-tiered shared cost system, which was implemented after *Kukor* was decided,

---

[28] In *Papasan v. Allain*, 478 U.S. 265, 286 (1986), the United States Supreme Court again analyzed whether a school funding scheme violated equal protection. The Court differentiated allegations that "petitioners have been denied a minimally adequate education," and the allegations of disparity in distributing funds. *Id.* The court found that the petitioners had not alleged the denial of a minimally adequate education because "they [did] not allege that they receive[d] no instruction on even the educational basics." *Id.* Similarly in this case, the Petitioners have not alleged a violation of equal protection under art. I, § 1, since they do not allege that students lack even a basic education. Their arguments, while couched in terms of adequacy, actually allege financial disparities.

is specifically designed to narrow per pupil spending disparities between districts. The school financing system seeks to equalize the tax base, not rate, of the school districts. *Elementary and Secondary Sch. Aids* at 10. Arguably, the system of taxation may actually penalize wealthier school districts because it is designed to tax districts that spend at a higher level. *See id.* (stating that "[a] school district that spends at a higher per pupil level than another will continue to face a higher tax rate unless the district is not subject to the formula because its local tax base exceeds the state's guaranteed tax base.") As such, the three-tiered classification system is rationally related to the legitimate governmental end of providing an equal opportunity for a sound basic education.

¶ 86. Finally, the legislative classifications set forth in Wis. Stat. §§ 121.91 and 121.92 relating to revenue limitations pass the rational basis test. We agree with the Respondents that revenue limitations "serve the legitimate state purpose of reducing the risk that local school boards would use the additional state aid to increase local spending by keeping tax rates as high as they had been before the infusion of additional state aid," instead of replacing local property taxes. (Resp't's Br. at 85.)

V

¶ 87. A majority of this court holds that Wisconsin students have a fundamental right to an equal opportunity for a sound basic education. An equal opportunity for a sound basic education is one that will equip students for their roles as citizens and enable them to succeed economically and personally. The legislature has articulated a standard for equal

opportunity for a sound basic education in Wis. Stat. §§ 118.30(1g)(a) and 121.02(L) as the opportunity for students to be proficient in mathematics, science, reading and writing, geography, and history, and to receive instruction in the arts and music, vocational training, social sciences, health, physical education and foreign language, in accordance with their age and aptitude. An equal opportunity for a sound basic education acknowledges that students and districts are not fungible and takes into account districts with disproportionate numbers of disabled students, economically disadvantaged students, and students with limited English language skills. So long as the legislature is providing sufficient resources so that school districts offer students the equal opportunity for a sound basic education as required by the constitution, the state school finance system will pass constitutional muster.

¶ 88. We conclude that the school finance system articulated in Wis. Stat. ch. 121 is constitutional under both art. X, § 3 and art. I, § 1 of the Wisconsin Constitution. The Petitioners have not shown beyond a reasonable doubt that the current school financing system violates either art. X, § 3, or art. I, § 1, and therefore, they have not made out a prima facie case in support of their motion for summary judgment.

¶ 89. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON, Justice WILLIAM A. BABLITCH, and Justice ANN WALSH BRADLEY join in the standard we have set forth in ¶ 3, ¶ 51, and ¶ 87. I am further authorized to state that Justice JON P. WILCOX, Justice DAVID T. PROSSER, and Justice DIANE S. SYKES join in our decision as to the constitutionality of the present school finance system.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 90. JON P. WILCOX, J. *(concurring).* I agree that the Petitioners' constitutional challenge presents a justiciable issue for this court. I also agree that the current system of school financing is constitutional and that there is no reason to remand the case for further proceedings.

¶ 91. However, I do not agree with the test that the majority opinion sets forth for examining whether the state school financing system violates art. X, § 3 of the Wisconsin Constitution. Therefore, I do not join ¶¶ 3, 48–53, or 87 of the majority opinion.

¶ 92. Article X, § 3 does not mandate absolute uniformity of equal opportunity for education in all school districts in this state. Majority op. at ¶ 46 (citing *Kukor v. Grover*, 148 Wis. 2d 469, 487, 436 N.W.2d 568 (1989)(Ceci, J., plurality) and *id.* at 514 (Steinmetz, J., concurring)). Legislative determinations in the area of school finance schemes are entitled to great deference by this court. Majority op. at ¶ 46 (citing *Kukor*, 148 Wis. 2d at 502–03 (Ceci, J., plurality) and *id.* at 512 (Steinmetz, J., concurring)).

¶ 93. Like the majority of this court, I conclude that the Petitioners have not demonstrated beyond a reasonable doubt that the present system of school financing is not "as nearly uniform as practicable" as guaranteed by art. X, § 3 of the Wisconsin Constitution. I respectfully concur.

¶ 94. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring in part and dissenting in part).* The majority opinion written by Justice Crooks estab-

lishes in paragraphs 3, 51 and 87 a standard for interpreting the uniformity provision of article X, § 3 of the Wisconsin Constitution. I join only paragraphs 3, 51, 87 and footnote 2 of Justice Crooks' opinion.[1] In

[1] The defendants at oral argument, unlike the plaintiffs, the plaintiff-intervenors, the circuit court and the court of appeals, did not request the court to set a standard. The defendants' position at oral argument, like that of the concurring justices, Justices David T. Prosser and Diane S. Sykes, was that the courts have no role in interpreting article X, § 3 of the Wisconsin Constitution; article X, § 3 speaks only to the legislature.

The suggestion that the court should not interpret the uniformity provision of article X, § 3 is contrary to the language of the constitution and this court's long-standing precedent. "The specific constitutional guarantee of education flows from the provision that the legislature provide for the establishment of district schools. Since the [legislature's] power to establish schools existed without a specific grant as an inherent function of state government. . .the clear purpose of article X, § 3, was to compel the exercise of the power to the extent designated." *Zweifel v. Joint Dist. No. 1*, 76 Wis. 2d 648, 658, 251 N.W.2d 822 (1977).

A "fundamental principle" of state constitutional law is that the Wisconsin Constitution, in contrast with the U.S. Constitution, is not a grant of, *but a limitation upon*, legislative power. "The purpose [of article X, § 3] was not to grant a power to the legislature to establish schools, for this power would exist without grant, but to compel the exercise of the power to the extent designated." *Manitowoc v. Manitowoc Rapids*, 231 Wis. 94, 97–98, 285 N.W. 403 (1939). *See also Buse v. Smith*, 74 Wis. 2d 550, 564, 247 N.W.2d 141 (1976) ("the search is not for a grant of power to the legislature, but for a restriction thereon"); *State ex rel. Dudgeon v. Levitan*, 181 Wis. 326, 339, 193 N.W. 499 (1923); *Pauly v. Keebler*, 175 Wis. 428, 439, 185 N.W. 554 (1921); *Outagamie County v. Zuehlke*, 165 Wis. 32, 36, 161 N.W. 6 (1917).

contrast to the majority, however, I would remand the cause to the circuit court.

¶ 95. Neither the parties nor the courts have had the opportunity to consider the state school finance system under the constitutional standard set forth in the majority opinion. Both the circuit court and court of appeals suggested other evidence that might be presented in this case. The majority opinion also points to evidence that is lacking in the record. *See* majority op. at ¶¶ 71, 72. After establishing a standard of constitutional interpretation the court should afford the parties an opportunity to develop additional facts, if needed, in the circuit court. Accordingly, I would remand the cause to the circuit court for further proceedings.

¶ 96. In remanding, however, I note my concerns and those of the circuit court, that the state school finance system is failing in certain respects. The state school finance system may be failing to provide each of the property-poor districts with the necessary resources to provide all students with the opportunity for a sound basic education. The state school finance system may be providing inadequate resources to those

---

Article X, § 3 is "a limitation upon the broad power of the state to educate its citizens through the establishment and operation of schools. The limitations are precisely stated: District schools, uniformity, and free tuition for certain ages." *Zweifel*, 76 Wis. 2d at 658.

I agree with the majority opinion that the task of interpreting the uniformity provision of article X, § 3, falls on the courts. If the function of interpreting the Wisconsin Constitution were left to the legislature, there would not only be a violation of the separation of powers doctrine, but also the legislature would be empowered to amend the constitution without abiding by the constitutional requirements for amendments.

districts with disproportionately large numbers of high needs students. The parties should have a chance to present evidence and argument relating to the standard set forth today.

I

¶ 97. The framers of the Wisconsin Constitution recognized the importance of education when they created article X governing the establishment and funding of public schools. Creating a system of free and uniform public schools was considered to be among the most essential of the framers' tasks.[2] Throughout the 1846 and 1848 conventions, the framers expressed the desire that all of Wisconsin's students, rich and poor, would be educated together in the public schools.[3] For example, the requirement in article X, § 4 that localities contribute to school funding was included "directly for the advantage of the poor," because it increased the commitment to local schools. Without local support "the common schools languished, and select schools rose on their ruins."[4]

¶ 98. The sweeping and revolutionary goals of article X were explained by Eleazor Root, the state's first superintendent of public instruction and a member of the education committee at the second constitutional convention. Root explained that the purpose of article X was to secure permanently to all the benefits of a free and comprehensive public school sys-

---

[2] Conrad E. Patzer, *Public Education in Wisconsin* at 18 (1924).

[3] *See The Convention of 1846* at 574–75 (Milo M. Quaife, ed., 1919).

[4] *Kukor v. Grover*, 148 Wis. 2d 469, 489, 436 N.W.2d 568 (1989) (quoting *Journal and Debates, Constitutional Convention* at 335 (1847–48)).

tem. "None are excluded, — none are condemned by the accidents of birth or fortune to grow up in ignorance. The state acts the part of a wise and affectionate parent, and dispenses its bounty with an impartial hand to all its children. . .[and] seeks to train them up so as to render them useful and honorable citizens."[5] In *State ex rel. Zilisch v. Auer*, 197 Wis. 284, 289–290, 221 N.W. 860 (1928), the court summarized the intent of the framers as follows:

> It is significant that [article X, § 3] applies to the "establishment of *district schools*," — not to the establishment of school districts. . . . An examination of the debates in the conventions that framed our present constitution and the constitution of 1846 (which contained a similar provision) discloses that the members of those conventions, when they were framing the article relating to schools, were concerned, not with the method of forming school districts, but with the character of instruction that should be given in those schools after the districts were formed, — with the training that these schools should give to the future citizens of Wisconsin.

¶ 99. Article X read as a whole demonstrates that the framers intended to require the legislature to create and finance a school system that is equitable and uniform in character throughout the state and that provides equal educational opportunity for all students.

¶ 100. The constitution "virtually declares that public education is a state power and function, based upon the well-established principle that the whole state is interested in the education of the children of

---

[5] *Report of the State Superintendent* at 13 (Dec. 31, 1849) in Plaintiff-Intervenors Appendix at 321.

the state and that this function must be exercised by the people as a whole. . . ."[6] The framers believed that the creation of free and uniform public schools was "the only system on which we could depend for the preservation of our liberties."[7] The legislature has recognized that "education is a state function" and that "the state must guarantee that a basic educational opportunity be available to each pupil."[8]

## II

¶ 101. The plaintiffs focus their claim on the inequities in the per capita student funds caused by the failure to provide sufficient equalization aid.[9] The plaintiffs focus on the "equity approach": they seek to eliminate the disparity among school districts by equalizing available resources, while recognizing that individual school districts should be able to spend more for their children's education. They argue that inequalities in the system stem from a failure to adjust adequately for the disparity in the property tax base.

¶ 102. The framers of the Wisconsin Constitution did not intend the school districts' boundaries to be

[6] Conrad E. Patzer, *Public Education in Wisconsin* at 37 (1924).

[7] *Kukor*, 148 Wis. 2d at 488 (quoting *Journal and Debates, Constitutional Convention* at 238 (1847–48)).

[8] Wis. Stat. § 121.01 (1997–98).

[9] The 181 plaintiffs in this case include school districts, parents, students and taxpayers. The following non-parties have filed briefs in this case: A coalition of state representatives and senators, the Mayor of Milwaukee, the ACLU of Wisconsin, the Council of Great City Schools, the Institute for Wisconsin's Future together with the Wisconsin Coalition for Advocacy, the Wisconsin Parent Teachers Association, Governor Tommy Thompson, and the Fair Air Coalition.

uniform and therefore could not have envisioned the school districts' taxing and spending capacity to be uniform, since taxing and spending ability and school district boundaries are related.[10] But the state school finance system must provide districts and schools with the funding needed to meet the constitutional mandate. The record, which is undisputed, shows that school districts vary widely in the amount spent per student (ranging from $13,534 to $5,301), in the ability to raise dollars for every mill levied, and in the actual levy rates.

¶ 103. The plaintiff-intervenors, the Wisconsin Education Association Council and a number of teachers and school administrators from school districts across the state, assert that the state school finance system is unconstitutional because it does not allow districts with significant numbers of high needs students to offer these students an adequate educational opportunity. High needs students include disabled children, economically disadvantaged children and children with limited skills in the English language. The State's brief concedes, as it must, that it probably costs more per child to educate high needs students.

¶ 104. A non-uniform education can result from treating similarly situated students and school districts differently, but it can also result from treating differently situated students and school districts in the

---

[10] The requirement of uniformity applies to the districts after they are formed, to the character of the instruction given, rather than to the means by which the districts are established and their boundaries are fixed. *See Larson v. State Appeal Bd.*, 56 Wis. 2d 823, 827, 202 N.W.2d 920 (1973); *Joint Sch. Dist. v. Sosalla*, 3 Wis. 2d 410, 420, 88 N.W.2d 357 (1958); *State ex rel. Zilisch v. Auer*, 197 Wis. 284, 289–90, 221 N.W. 860 (1928).

same way.[11] Consequently, to ensure that all students have an opportunity for a sound basic education, school districts with a disproportionate number of high needs students must be provided with extra financial resources to meet the standard that is constitutionally required.

¶ 105. The plaintiff-intervenors argue that the current state school finance system fails to account for the distinct needs of school districts that have a disproportionate number of high needs students, so that these school districts are unable to provide educational opportunities that are sufficiently uniform or basic.[12] For example, the plaintiff-intervenors emphasize, and the State admits, that the State reimburses districts

---

[11] In his dissent in *Kukor*, 148 Wis. 2d at 516–17, 525, which I joined, Justice William A. Bablitch wrote:

> The fundamental flaw of the state formula is that it distributes dollars without regard to educational needs. It assumes that every child in this state begins his or her educational journey from the same starting point. If all children began that journey from the same starting point, then the formula would provide no constitutional objection: every child would start with the same opportunity. That may well have been the reality, with few exceptions, in 1848. It is not even close to reality today. The result is that a significant number of school children in this state are denied an equal opportunity to become educated people.
>
> . . .
>
> However, a close inspection of the record reveals that while some special needs of "exceptional" students are being met in overburdened school districts, such special needs programs are draining resources and staff from regular programs of instruction.

[12] The plaintiff-intervenors state the issue in the Reply Brief at 16 as follows:

> [W]hether the combination of revenue limits and declining categorical aids have prevented some of Wisconsin's children from receiving the basic education and equal educational opportunity to which they are constitutionally entitled.

for only approximately 39% of the cost of educating disabled students and 25% of the cost of educating limited English-speaking (LES) students. With regard to economically disadvantaged students, the state school finance system has provided no extra resources on a statewide basis.[13]

¶ 106. Because the state school finance system fails to address the costs of educating high needs students, the plaintiff-intervenors argue that schools or school districts with a disproportionate number of such students are not able to provide anywhere near the educational opportunities of other schools or school districts.[14] While the state school finance system

---

[13] The plaintiff-intervenors note that the State has implicitly accepted that these children require more resources by recently instituting the "SAGE" program (Student Achievement Guarantee in Education) on a pilot basis, which is aimed at reducing class size in high-poverty schools. Plaintiff-Intervenors Brief at 14.

[14] One of the biggest problems with the current state school finance system, according to the plaintiff-intervenors, is the recently adopted revenue limits. Revenue caps or limits restrict the amount of revenue a district can raise from state aid and local property taxes. *See* Wis. Stat. § 121.90 *et seq.* The base spending limit is calculated from a school district's spending in the 1992–93 school year, and a statutorily defined flat rate spending increase is allowed each year. The spending increase was $206 per student in 1996–97. A local school district may exceed these revenue limits only by a voter referendum. Plaintiff-Intervenors Brief at 10–11.

The plaintiff-intervenors argue that these revenue limits contribute heavily to a state school finance system that is arbitrary and refuses to take into account high needs students. These limits are based, according to the plaintiff-intervenors, on the misguided assumptions that all students cost the same to educate and that educational needs do not change over time.

especially fails property-poor school districts with disproportionate numbers of high needs students, the plaintiff-intervenors assert that even property-rich school districts that have disproportionate numbers of high needs students, such as Madison, are unable to offer educational opportunities that are uniform with the rest of the state.[15] School districts with large numbers of high needs students may have to divert funds to pay for the higher costs associated with the high needs students, leaving the other students at a disadvantage.[16]

¶ 107. Wausau, for example, as a result of Hmong resettlement, has a kindergarten enrollment of 34% LES students. Because of the high costs associated with educating such students, only a small portion of which is reimbursed by the state, the Wausau education community faces severe funding shortages. Wausau has been forced to cut staffing and is unable to implement certain state-mandated programs.[17]

¶ 108. In Milwaukee the school district suffers the combined effects of being a relatively property-poor

---

[15] For a discussion of the impact of high needs students on Madison's school district, *see* Gia Weier, *Heading Toward A Crisis?*, The Isthmus, May 19, 2000, at 5 (discussing Madison's growing problem in providing adequately for its disabled students while maintaining a strong curriculum for other students).

[16] For challenges to state school finance systems based on educational equality and educational adequacy, *see, e.g., Rose v. Council for Better Education*, 790 S.W.2d 186 (Ky. 1989); *McDuffy v. Secretary of the Executive Office of Education*, 615 N.E. 2d 516 (Mass. 1993); *Pauley v. Kelly*, 255 S.E.2d 859 (W. Va. 1979); Peter Enrich, *Leaving Equality Behind: New Directions in School Finance Reform*, 48 Vand. L. Rev. 101 (1995).

[17] *See* Plaintiff-Intervenors Brief at 38–40 and Appendix at 271–78.

district along with having a disproportionate number of high needs students. According to the briefs, which are not disputed, approximately 70% of Milwaukee's students are economically disadvantaged to the extent that they qualify for a free or reduced-cost lunch. Over 12,000 of Milwaukee's students are reported as homeless, constituting more than 10% of the student population.[18] Milwaukee educates more than 25% of the state's LES students and more than 36% of the state's students living in poverty. In addition, Milwaukee asserts that it has the comparative disadvantage of being surrounded by a number of the state's richest school districts. Twelve of the thirty-four school districts that the State concedes are "unequalized," in that they have a disproportionately large amount of resources with which to fund their schools, are within commuting distance of Milwaukee. A non-party brief filed by Milwaukee Mayor John Norquist asserts that these "unequalized" rich school districts drain students, teachers, and resources from the comparatively underfunded Milwaukee schools.[19]

¶ 109. The evidence submitted shows that some Milwaukee school facilities are old and decrepit, that staffing shortages exist, and that vocational education and other programs have been reduced significantly because of financial limitations. Milwaukee students scored dramatically below the state averages in the 1997–98 Wisconsin Student Assessment System test administered by the Department of Public Instruction. For example, only 26% of Milwaukee tenth-graders achieved a proficient or advanced score on the reading

[18] *See* American Civil Liberties Union Brief at 9–10; Plaintiff-Intervenors Appendix at 282–85.

[19] *See* Mayor Norquist Brief at 6–8.

examination, compared with the statewide average of 63%.[20]

¶ 110. The plaintiff-intervenors argue that the statewide tests offered by the Department of Public Instruction in the fourth, eighth and tenth grades show that LES students, economically disadvantaged students and disabled students have drastically lower rates of achieving a level of "proficiency or above."[21]

¶ 111. Although the defendants' brief de-emphasizes the differences in educational opportunities offered to students around the state and characterizes the plaintiffs' evidence as anecdotal, the defendants were not able to confirm or dispute school district–specific allegations concerning course offerings, physical plants, staffing and other items. The circuit court suggests that at least some property-poor districts are having difficulty with providing adequate educational opportunities to their students.

¶ 112. The evidence, according to the circuit court, suggests that the school districts' inability to raise funds has resulted in increased class size with classes sometimes taught in partially condemned buildings, basements, storage rooms, hallways, auditorium stages, unused shower facilities, elevator shafts and janitorial closets. The circuit court found that maintenance of facilities is often delayed, resulting in leaking roofs, antiquated heating and cooling systems, inadequate lighting and water running through the walls. Furthermore, the circuit court found that in some districts textbooks are outdated and a lack of options in advanced math, science, electives, computer technology and extracurricular activities exists.

---

[20] *See* American Civil Liberties Union Brief at 10.

[21] *See* Plaintiff-Intervenors Appendix at 324–325.

¶ 113. The circuit court also found that school districts that spend more per student are able to provide their students with more opportunities in a variety of areas while students in property-poor school districts do not have equal educational opportunities.

¶ 114. Judge Charles P. Dykman, in his concurrence in the Court of Appeals, concluded from the record that "lower spending school districts are laboring under very difficult conditions."

¶ 115. I recognize that the State provides funds to educate limited–English speaking students and disabled students in the form of categorical aids. Although this aid reimburses the school districts for only a portion of the cost of educating these high needs students, the circuit court on remand would determine whether this additional aid is sufficient to enable all school districts with the resources to provide students with an equal opportunity for a sound basic education.

¶ 116. Although I realize that equal dollars do not necessarily translate to equal educational opportunity, it is clear that substantial funding differences may significantly affect students' opportunities to learn. Money is not the only variable affecting educational opportunity, but it is one that the legislature can equalize.

¶ 117. Both the circuit court and court of appeals acknowledged that they were unable to adequately adjudicate this case because of the lack of a developed standard from this court regarding the requirements of article X, § 3. I would remand the cause to the circuit court for further proceedings in light of the standard the majority opinion sets forth in the present case to determine whether the defendants have met their constitutional obligation.

¶ 118. The circuit court would determine whether the disparities in funding among school districts result in an unacceptable level of inequality in educational opportunity. The circuit court would also decide whether those students in property-poor districts or in school districts with disproportionate numbers of high needs students are offered unacceptably diminished educational opportunities.

¶ 119. If the plaintiffs' and plaintiff-intervenors' proof is sufficient, the circuit court would not be limited to choosing between declaring the entire state school finance system constitutional or unconstitutional. It may be that the state school finance system is constitutionally acceptable for some school districts, but not for others.

¶ 120. If the circuit court were to declare all or part of the present state school finance system unconstitutional, it would not be up to the circuit court to adopt a state school finance system that the circuit court considers to be constitutional. Courts interpret the constitutional mandate. As the representatives of the people, the legislature should craft the state school finance system. There are doubtless numerous ways a legislature might design a constitutionally acceptable state school finance system.

¶ 121. Any declaration of unconstitutionality would cast no aspersion on the legislative or executive branches of government, which assuredly have worked very hard to craft our current educational system. The legislature has appropriated vast sums of money for education in this state. The executive branch has worked diligently to improve the students' proficiency.

¶ 122. The legislative and executive branches and the citizens of the state recognize the high cost of further improving the educational system, but they

also realize that the cost of not improving the educational system to meet the constitutional mandate will be much higher. As Derek Bok, former president of Harvard University, wisely stated, "If you think education is expensive, try ignorance."

¶ 123. I would remand the cause to the circuit court for further proceedings. For the reasons set forth, I write separately.

¶ 124. I am authorized to state that Justices WILLIAM A. BABLITCH and ANN WALSH BRADLEY join this opinion.

¶ 125. WILLIAM A. BABLITCH, J. *(concurring in part, dissenting in part)*. This is a landmark case in the history of education for the state of Wisconsin. For the first time, this court has articulated the standard behind the constitutional guarantee to our children of an equal opportunity for education. With three justices, including this writer, joining that part of the majority opinion of Justice Crooks that articulates a constitutional standard for education, the guarantee of an equal opportunity for education finally has teeth.

¶ 126. Unfortunately, a different majority concludes that the present system meets constitutional muster. I disagree. I agree with the concurrence/dissent of Chief Justice Abrahamson that this case should be remanded for further proceedings, in light of the standard we set in the majority opinion, to determine whether the defendants have met their constitutional obligation. This record raises serious and troubling questions about our system of education that should be examined more thoroughly below.

¶ 127. Accordingly, I join paragraphs 3, 87, footnote 2, and Section II of the majority opinion, and join

the concurrence/dissent of the Chief Justice.[1] I write to more fully document the condition of education in this state as shown in the circuit court. This evidence is not in dispute.

¶ 128. This record demonstrates that various school districts suffer from woeful conditions: inadequate course offerings, an inability to raise further funds for ever-increasing educational demands from the state and federal government, and special needs that are either going unmet or are being met at the expense of regular education programs. This record further shows great financial disparities among school districts. As a result of all of this, it cannot come as a surprise that tens of thousands of children across the state fail to meet even basic competency in reading, writing, mathematics, language, science, social studies

---

[1] The standard we adopt today recalls the standard which I urged in my dissent 11 years ago in *Kukor v. Grover*, 148 Wis. 2d 469, 520–21, 436 N.W.2d 568 (1989), joined in by then-Justice Shirley S. Abrahamson and Chief Justice Nathan S. Heffernan:

> [The constitutional requirement] has generally been defined as embracing broad educational opportunities needed to equip children for their roles as citizens, participants in the political system, and competitors in both the labor market and the market-place of ideas. [citations omitted].
>
> . . .
>
> I conclude that the mandate given by the uniformity clause in art. X, sec. 3 of the Wisconsin Constitution is that the state provide a character of instruction in the state schools such that all children are provided with a uniform opportunity to become equipped for their future roles as citizens, participants in the political system, and competitors both economically and intellectually. In short, the state must provide a character of instruction that allows each child an opportunity to become an educated person.

It was a standard based not on financial disparities but on the adequacy of the education provided. I read adequacy of education as the focal point of our newly adopted standard.

and the arts. These children have major gaps in knowledge and skills basic to progress. For these children, the constitutional guarantee of an education is an empty promise.

¶ 129. Despite the historic and commendable efforts by the Governor and the legislature to support public education, after reading this record one is left with the overwhelming realization that, for too many of our children, those efforts have not satisfied even a minimal constitutional guarantee of an equal opportunity for an adequate education.

¶ 130. This record should leave every citizen greatly concerned at the lack of fairness and opportunity for tens of thousands of children in our schools. For a state founded by immigrants and built with a common commitment to education for all, rich and poor alike, regardless of the accident of place of birth, this record shows that we have drifted far from the dreams of our ancestors.

¶ 131. Several distinct categories illustrate the systemic problems in education.

¶ 132. Plants and equipment. Undisputed affidavits in the record illustrate that conditions in many districts across the state are hardly conducive to education. Maintenance is deferred, if done at all. Leaks, cracks, obsolete lockers go unrepaired. Libraries are inadequately stocked. Computers, where they exist, are largely out of date. School buses are run-down and accordingly more expensive to fix. As buses dwindle, transportation of students takes more time: One district has children traveling 90 minutes, leaving home at 6:50 a.m. and arriving to school at 8:20 a.m.

¶ 133. House trailers, storage rooms, hallways, elevator shafts, and the like are used for classrooms. In one school science class is held in a trailer, but has no

658

science equipment. Social studies is being taught off a cart, room to room. Special education therapy space is provided in a janitor's area; and in one school it is held in a storage room closet off the stage. Another school has school suspension served in a janitor's closet.

¶ 134. Many schools are unable to provide facilities that are accessible to people with disabilities. Playgrounds are unsafe, uninsured, and unequipped.

¶ 135. <u>Course offerings</u>. In many schools, course offerings are being curtailed due to needs in other educational areas. Textbooks are seriously outdated. Languages have been cutback or completely eliminated. Advanced courses in subjects such as science, math, and technology are taught on an alternate year schedule. Electives, such as family and consumer economics classes and technical education classes, have been eliminated. Career counseling in many schools is severely limited or nonexistent. Funds for training staff in computer technology are unavailable, which together with inadequate equipment make it impossible to teach basic computer skills.

¶ 136. <u>Children with special needs</u>. It is undisputed in the record that public schools are facing a significant increase in the number of special needs students. These students generally fall into three, sometimes overlapping, categories: Limited English Speaking (LES) students, children living in poverty, and children with disabilities. The children come to school lacking the language, social, and cultural tools many of us take for granted. These children must be taught how to learn before they can begin to learn.

¶ 137. A commonly voiced concern by numerous districts in the state is that special education programs established to meet these needs are eating up the dollars from other already limited education programs.

The communities of Wausau and Milwaukee are striking examples of this problem.

¶ 138. Wausau has experienced a significant increase in the number of Hmong students, approximately 22 percent in the last ten years, and increasing steadily. The kindergarten enrollment is 34 percent LES students. The language problems are significant. Communications between teacher and student, and between teacher and parent, are severely limited. Accordingly, LES costs, including indirect costs, are high; but unfortunately, state reimbursement has been decreasing. Currently, the state reimburses for 25 percent of the direct LES costs, none for the indirect costs. Direct costs associated with these needs exceed $2.5 million. Indirect costs exceed $1 million. As a result, Wausau School District has had to curtail programs and staffing. It is grossly understaffed in its health services program, despite the increasing number of high needs students who have greater health requirements. Wausau has been unable to implement the state-mandated middle school foreign language program. It has been forced to make cuts with respect to staff development and teacher mentor programs. It has been unable to implement its five-year technology plan, estimating the district is spending approximately three times less on its technology budget compared with adequate technology programs in other districts.

¶ 139. Wausau is trapped in a vicious cycle. As it reduces its general program quality to make up for mandated special needs, students without special needs leave for private schools to seek the quality that public schools no longer provide. With the resulting drop in enrollment, state dollars decrease and the schools must further reduce program quality.

¶ 140. Milwaukee must address perhaps an even larger struggle. It is faced with a large number of high needs students. Approximately 80 percent of its students qualify for free or reduced lunch. Over 12,000 of their students are reported as homeless. Poverty undisputedly leads to distinct learning problems. As with Wausau, the needs of these students inevitably impact on regular educational programs.

¶ 141. Financial disparities. The record, which is undisputed, shows inter alia the following financial disparities:

1. School districts vary widely in the amount spent per pupil, ranging from $13,534 to $5301.

2. The levy rates vary widely, ranging from $4.71 to $20.63 per thousand.

3. The ability to raise dollars for every mill levied varies widely. For example, in 1996–67 Gibraltar was able to raise $1,270,000 for every mill levied; Bowler was able to raise $55,000 for every mill levied.

¶ 142. The effects of these disparities are many. To name but two:

1. Property poor districts that tax at the same rate as property rich districts have significantly fewer dollars to spend on education. For example, the two like-size districts of Neenah and Elmbrook tax at approximately the same rate of $11.55 per thousand. However, due to the disparity of tax base, Elmbrook is able to spend $1400 more per pupil than Neenah, which amounts to over $9,000,000 more available to Elmbrook than to Neenah for educational needs.

2. In some like-size districts, which spend the same, the tax burden on the taxpayer is significantly disparate. For example, Beloit and Wauwatosa spend approximately $8500 per pupil. Yet Beloit must tax

their taxpayers $2.17 per thousand more than Wauwatosa to raise the same amount of dollars.

¶ 143. The circuit court found that this evidence was undisputed. Plaintiffs assert that the system's disparities deny students in property-poor districts equal educational opportunities. Based on this record it is hard to disagree. But without a standard, the circuit court was powerless.

¶ 144. <u>Statewide testing</u>.

One measure of student achievement is the Wisconsin Student Assessment System (WSAS) Knowledge and Concepts Examinations at grades four, eight, and ten. Student scores were reported in four general proficiency categories: advanced, proficient, basic, and minimal performance.

¶ 145. "Advanced" means achievement beyond mastery, in depth understanding.

¶ 146. "Proficient" means competent, including mastery of the important knowledge and skills.

¶ 147. "Basic" means somewhat competent, mastery of most of the important knowledge and skill, but evidence of at least one major flaw in understanding.

¶ 148. "Minimal Performance" means limited in content, evidence of major misconceptions or gaps in knowledge and skill basic to progress.

¶ 149. The scores achieved leave serious questions as to the adequacy of education achieved by tens of thousands of children across the state.

¶ 150. Based upon this testing, in the fall of 1996 the Wisconsin Department of Public Instruction estimated[2] that in reading, 8 percent of the fourth graders, 15 percent of the eighth graders, and 14 percent of the tenth graders were in the "Minimal Performance Cate-

[2] These statewide estimates are based on samples developed by CTB/McGraw Hill under contract with DPI.

gory." Assuming approximately 60,000 students in each grade tested, 4800 fourth graders, 9000 eighth graders, and 8400 tenth graders had an education achievement that was limited in content, with major misconceptions or gaps in knowledge and skills basic to progress.

¶ 151. With respect to language and writing skills, 10 percent (that is, 6000 children) of the fourth graders, 19 percent (11,400 children) of the eighth graders, and 14 percent (8400 children) of the tenth graders had an education achievement that was limited in content, with major misconceptions or gaps in knowledge and skills basic to progress.

¶ 152. The figures are even worse in mathematics and science. For example, in mathematics 33 percent of the tenth graders (20,000 children) had an education achievement that was limited in content, with major misconceptions or gaps in knowledge and skills basic to progress.

¶ 153. This lack of educational achievement is particularly evident in the scores of children with special needs, of which there are tens of thousands of the over 800,000 students in K–12. In reading, although 74 percent of the English proficient students in fourth grade were either at the "Proficient" or "Advanced" levels, only 28 percent of the Limited English Proficient students were at those levels. Seventy-nine percent of the students without disabilities were at those levels, while only 31 percent of the disabled students were at those levels.

¶ 154. These wide disparities continue through the grades tested, and cut across mathematics, language, arts, science, and social studies.

¶ 155. It is shaming to this great state.

¶ 156. By a slim majority, this court today decides that the present system is constitutionally acceptable. However, if the conditions outlined above remain unattended, the system will inevitably get worse. If the legislature does nothing, the children will be back demanding their constitutional guarantee.

¶ 157. Unquestionably, the cost to fix the system is high. The cost of not fixing it will be much higher: Uneducated citizens will extract extremely high social costs in the future. As the mechanic on television says, "You can pay me now or pay me later."

¶ 158. DAVID T. PROSSER, J. *(concurring in part; dissenting in part)*. The principal issue in this case is stated by the petitioners: "Does the Wisconsin school finance system violate the Uniformity Provision of the Education Article, article X, § 3 of the Wisconsin Constitution?" A majority of the court holds that it does not. Three justices, however, would rule otherwise. Moreover, these three justices and Justice Crooks interpret art. X, § 3 in a manner that encourages future litigation and will plunge the judiciary into the legislature's domain.

¶ 159. I join the concurring opinion of Justice Sykes not because I am unwilling to apply standards embedded in the text of the constitution or in statutory law—whatever the field, regardless of the consequences—but because I am unwilling to impose legal standards that did not exist before this decision.

I

¶ 160. A majority of the court embraces the proposition that art. X, § 3 of the Wisconsin Constitution gives Wisconsin students "a fundamental right to an

664

equal opportunity for a sound basic education. An equal opportunity for a sound basic education is one that will equip students for their roles as citizens and enable them to succeed economically and personally." Majority op. at ¶¶ 3, 51, 87. Chief Justice Abrahamson's concurrence/dissent at ¶ 94.

¶ 161. Constitutional principles must be rooted in constitutional text. Four members of the court maintain that the standard they embrace is rooted in art. X, § 3. They are mistaken. Article X, § 3 was part of the original constitution. The relevant text now reads:

> The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years; and no sectarian instruction shall be allowed therein; but the legislature by law may, for the purpose of religious instruction outside the district schools, authorize the release of students during regular school hours.

Our analysis must begin with the language of the constitution. Two phrases in art. X § 3 stand out: "district schools" and "as nearly uniform as practicable."

¶ 162. First, the text emphasizes the term "district schools" not "school districts." There is danger in assuming that these terms are synonymous. They are not. A 1972 amendment to art. X, § 3 authorizing the release of students for religious instruction repeated the term "district schools." The 1972 amendment altered the text of the original section, substituting "4" for "four" and "20" for "twenty," but it did not change the term "district schools."

¶ 163. Section 3 uses the term "district schools" followed by the phrase "*such* schools" and the clause

665

"no sectarian instruction shall be allowed *therein*," although religious instruction "*outside* the district schools" is permitted (emphasis added).

¶ 164. By contrast, art. X, §§ 2 and 5 both employ the term "school district." These sections also were part of the original constitution. Article X, § 2 refers to "support and maintenance of common schools, in each school district." Article X, § 5 provides that no appropriation shall be made from the school fund to "any school district for the year in which a school shall not be maintained at least three months." The constitution is precise in avoiding state payments from the school fund to individual schools.

¶ 165. A fair reading of these sections suggests that "school districts" are political entities, whereas "district schools" are literally schools. The legislature distributes state aid to the political entities—to the school districts. Consequently, it is troublesome to base a cause of action that school districts must be made uniform on a section of the constitution, art. X, § 3, that does not apply to them.

¶ 166. It is even more unsettling to give Wisconsin students "a fundamental right to an equal opportunity for a sound basic education" and to ground that right in a section that makes no reference to individual rights, only to "district schools." The responsibility of this court in constitutional interpretation is to state the law, not make the law.

¶ 167. Second, art. X, § 3 contains the phrase "as nearly uniform as practicable." The uniformity in the text is indisputably diluted by the adjacent phrases "as nearly" and "as practicable." "As nearly uniform as practicable" does not mean "equal." "As nearly uniform as practicable" is not as strong or uncompromising as the storied phrase "equal protection of the law." The

words in the text suggest a goal; they do not impose a rule.

¶ 168. Article X, § 3 may be compared to art. IV, § 23 of the Wisconsin Constitution, which addresses town government and provides in part: "The legislature shall establish but one system of town government, which shall be *as nearly uniform as practicable*" (emphasis added). Because this section closely parallels art. X, § 3, this court should look to the experience with town government for guidance in interpretation.[1] This court has declared that the "uniformity requirement [in art. IV, § 23] has been consistently interpreted not to require absolute uniformity in the system of government, but only practical uniformity. . . .[T]he framers of the constitution recognized that some latitude had to be provided to enable the legislature to authorize departures from absolute uniformity." *State ex rel. Wolf v. Town of Lisbon*, 75 Wis. 2d 152, 162, 248 N.W.2d 450 (1977).

---

[1] Jack Stark summarizes the litigation under this section in his book, *The Wisconsin State Constitution, A Reference Guide* at 100 (1997):

> According to this section "the principal organizational features of town government must be the same," but, as the section specifies, only "practical" uniformity is required, so general enactments that make reasonable distinctions among towns are constitutional [*State ex rel. Wolf v. Town of Lisbon*, 75 Wis. 2d 152, 161–62, 248 N.W.2d 450 (1977)]. As to reasonable distinctions, this section "provides for the exercise of different powers by the boards of different towns, when there is anything in a town which calls for the exercise of such different or additional powers" [*Land, Log & Lumber Co. and others v. Brown and others*, 73 Wis. 294, 40 N.W. 482 (1889)]. That is, a law that applies throughout the state and makes reasonable distinctions based on differences among towns does not violate this section [*Thompson v. Kenosha County*, 64 Wis. 2d 673, 221 N.W. 845 (1974)].

## II

¶ 169. Over the years, both the legislature and Wisconsin courts have interpreted the Education Article, including art. X, § 3. They have not required uniformity among school districts. The legislature has never required that school districts be equal or uniform in terms of population or enrollment or geographic area. School districts have been created in different ways, *T.B. Scott Lumber Co. v. Oneida County*, 72 Wis. 158, 161 (1888); *Maxcy v. Oshkosh*, 144 Wis. 238, 260, 128 N.W. 899 (1910), and they have not been uniform in their organization or reorganization. *Joint Sch. Dist. v. State Appeal Board*, 56 Wis. 2d 790, 794, 203 N.W.2d 1 (1973). The state authorizes common school districts, union high school districts, and unified school districts. Wis. Stat. §§ 120.001–120.44. These districts may serve different grades. Not all school districts have kindergarten for four-year-olds. *Zweifel v. Joint Dist. No. 1., Belleville*, 76 Wis. 2d 648, 251 N.W.2d 822 (1977). Compensation among the school districts is not uniform, and employee benefits are not uniform. In *Buse v. Smith*, 74 Wis. 2d 550, 568, 570, 247 N.W.2d 141 (1976), this court recognized the obvious fact that not all school districts have equal revenue raising power and held that art. X, § 3 did not require equalization of revenue raising power.

¶ 170. Given the text of art. X, § 3, the immense diversity of school districts and district schools and the precedent of prior decisions about what art. X, § 3 does not mean, the court should have dismissed claims that the legislature has a constitutional obligation to equal-

ize educational opportunity among school districts in terms of dollars.[2]

¶ 171. What the court has done instead is to embrace two conflicting theories of what the section requires: Equality of resources for school districts and special attention to special needs, beyond equality. In short, EQUALITY PLUS. This may be desirable social and educational policy but it does not arise from the text of our constitution. It is distinctly legislative in character.

¶ 172. Until today, this court has had difficulty imposing uniformity on much of anything based upon the language of art. X, § 3. The court attempted to explain this section in *State ex rel. Zilisch v. Auer*, 197 Wis. 284, 289–90, 221 N.W. 860, (1928). In response to arguments about detachment from a school district, the court said:

> An examination of the debates in the conventions that framed our present constitution and the constitution of 1846 (which contained a similar provision) discloses that the members of those conventions,

[2] In his brief, Governor Thompson argues that the equalized share of state support for public education has increased from 72.3 percent of state aid in 1986–87 to 77.6 percent in 1998–99. Non-Party Brief by Governor Tommy G. Thompson at 4. The first tier of the three-part general school aid formula is for costs shared between the state and school district up to a primary cost ceiling of $1,000 per student. The state's share at this level is calculated using a guaranteed property valuation of $2 million per student. 1997–98 *Wisconsin Blue Book*, p. 291. Plaintiffs argue that the first tier creates disequalizing spending disparities by its hold harmless feature. The Governor responds that this disequalization has fallen from 0.7 percent of total equalization payments in 1996–97 to 0.52 percent in 1999–2000. *Id.* at 5.

when they were framing the article relating to schools, were concerned, not with the method of forming school districts, but with the character of instruction that should be given in those schools after the districts were formed,—with the training that these schools should give to the future citizens of Wisconsin.

Viewing the terms of this constitutional provision in the light of its express terms as well as of the purpose which actuated those who drafted it, we conclude that the requirement as to uniformity applies to the districts after they are formed,—to the character of the instruction given,—rather than to the means by which they are established and their boundaries fixed.[3]

¶ 173. The court cited no authority for these passages. In fact, the language was inspired by the brief of respondent (Zilisch) who did not point to constitutional debates. Rather, counsel relied on a Wisconsin case, *State ex rel. Dick v. Kalaher*, 145 Wis. 243, 129 N.W. 1060 (1911), which defines a school: "School is a generic term, and denotes an institution for instruction or education" (citing *American Asylum v. Phoenix Bank*, 4 Conn. 172 (1822); 7 Words & Phrases, 6343). Then counsel argued:

It is this *institution* and not the *district* to which the constitutional provision applies. This is shown by the plain wording of the constitution which limits the requirement of uniformity to "*schools*" and merely prefixes the word "district" to denote the type of schools.

[3] In reaching this conclusion, the court overruled *State ex rel. Brown v. Haney*, 190 Wis. 285, 209 N.W. 591 (1926).

This plain and natural construction has been followed by the courts, under similar constitutional provisions. The decisions hold that such uniformity relates only *to the character of the institution, called the school.*

Respondent's Brief at 64. Today, a new constitutional right is founded on the argument of counsel in a school detachment case almost three-quarters of a century ago.

## III

¶ 174. In the early years of statehood, the hiring and licensing of teachers was entirely a local matter. *Wisconsin Blue Book,* p. 432 (1999–2000). For a number of years, state support of public education consisted of money derived principally from the sale of public lands that the federal government had granted to the state. *Id.* In Chapter 287, Laws of 1885, the legislature levied a one-mill state property tax to be collected by the state and distributed to counties for school support. *Id.* The state's first attempt to equalize tax support for schools in property-poor districts was the Wisconsin Elementary Equalization Law of 1927 (Chapter 536).[4] *Id.*

¶ 175. In 1995, the legislature appropriated more than $4 billion to provide 66.7 percent of the revenue for public K–12 schools in Wisconsin beginning in the 1996–97 school year. The money included general aid, delivered through a three-tier formula,

---

[4] According to the 1999–2000 *Wisconsin Blue Book,* Chapter 536, Laws of 1927, was promoted by State Superintendent of Public Instruction John Callahan, who urged a 40 percent level of state support for local school costs. This figure was not reached until after 1970. There was no state support for high schools until 1875. 1999–2000 *Wisconsin Blue Book,* p. 432.

categorical aid, and school levy credits. The increase over the 1995–96 school year was more than $950,000,000. School funding was increased 5.9 percent for the 1997–98 school year and 5 percent for the 1998–99 school year. Legislative Fiscal Bureau, 1997–98 Wisconsin State Budget, Comparative Summary of Budget Provisions, Public Instruction, at 862–63. These are the school finance plans under challenge.[5]

¶ 176. This court on many occasions has observed that all legislative acts are presumptively constitutional. If doubts exist about a statute's constitutionality, we must resolve them in favor of the constitutionality of a statute. "Our task is not to judge the merits of the statute or the wisdom of the legislature. Our task is to determine whether the statute clearly contravenes some constitutional provision." *Busé*, 74 Wis. 2d at 583 (Abrahamson, J., Day, J., and Heffernan, J. dissenting).

¶ 177. We do not hide from the deficiencies that exist in this state's system of public education. We are not insensitive to the fact that fiscal resources are not equal. We might even have salutary proposals for improvements. But it is not the role of the supreme court to shape education policy or provide revenues.

---

[5] The court obtained printouts of school referenda in the 1990s from the Department of Public Instruction. According to our calculations, there were 166 successful referenda to exceed revenue caps in the four years 1996–1999. These referenda totaled approximately $85,000,000. There also were approximately 335 successful referenda on long term debt during these same four years. The value of these referenda exceeded $2.5 billion. Local school referenda are part of the state school finance system. A number of the school district plaintiffs in this case participated in successful referenda.

This vital responsibility is reserved to the executive and the legislative branches. The judiciary's task is to determine whether the acts or omissions of other branches clearly contravene some constitutional provision. In my view, they do not.

¶ 178. I join the majority opinion in affirming the court of appeals and in holding the present school finance system constitutional. In other respects, I dissent.

¶ 179. I am authorized to state that Justice DIANE S. SYKES joins this concurring/dissenting opinion.

¶ 180 DIANE S. SYKES, J. *(concurring in part; dissenting in part)*. I agree with the majority's conclusion that the state school finance system is not unconstitutional under Wis. Const. art. X, § 3, the uniformity clause of the education article, or Wis. Const. art. I, § 1, the Equal Protection Clause. Therefore, I join sections I and III of the opinion, as well as the decision to affirm. However, I cannot agree with sections II and V of the majority opinion, which announce an expansive new state constitutional right under art. X, § 3 to "an equal opportunity for a sound basic education," defined as an education "that will equip students for their roles as citizens and enable them to succeed economically and personally." Majority op. at ¶¶ 3, 51, 52, 87.

¶ 181. The petitioners allege that the current school finance formula violates the uniformity clause of the education article as well as the Equal Protection Clause of the Wisconsin Constitution by creating or failing to redress alleged educational disparities in so-called "property-poor" districts, districts with many

high-needs children, and districts where charter schools and the school choice program decrease the enrollment in the public schools. Four members of this court are convinced that in order to decide the uniformity clause challenge, the court is required to articulate a constitutional standard or test for the right to education under art. X, § 3. And they have done so, by reference to an elaborate definition of "educational adequacy" that has no support in the text of the constitution itself nor in any of our prior art. X, § 3 cases.

¶ 182. Any definition of education or standard for educational adequacy is inherently a political and policy question, not a justiciable one. The people of this state—through their elected representatives in the legislature, the governor's office and local school boards—decide what their schools will teach and how much education is adequate or desirable for their children. What constitutes an "adequate" or "sound" or even "basic" education is most emphatically not a question of constitutional law for this or any other court.

¶ 183. As the majority opinion discusses at length, our cases pertaining to the education article have held that the framers of the Wisconsin Constitution were concerned with the nature, character and purposes of education—not the technicalities of school district size, boundaries or composition—and viewed education as necessary to the preservation of liberty and the perpetuation of a productive, honorable citizenry. Majority op. at ¶¶ 31–47; *Kukor v. Grover*, 148 Wis. 2d 469, 485–90, 436 N.W.2d 568 (1989); *Busé v. Smith*, 74 Wis. 2d 550, 564–66, 247 N.W.2d 822 (1977); *State ex rel. Zilisch v. Auer*, 197 Wis. 284, 289–90, 221 N.W. 860 (1928).

¶ 184. But I do not read these cases to mean that art. X, § 3 commits to the judiciary, in the exercise of its obligation of constitutional interpretation, questions of educational adequacy, content or scope. There is certainly nothing in the text of art. X, § 3 to support such a conclusion. Wisconsin Const. art. X, § 3 provides:

> The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years. . . .

¶ 185. The other sections of the education article pertain to the election of the state superintendent of public instruction (art. X, § 1), the school fund (art. X, §§ 2, 5), local school taxes (art. X, § 4), the state university system (art. X, § 6) and the sale of school and university lands (art. X, §§ 7, 8). There is nothing in the education article that specifically or even generally addresses the content, character or scope of the education the legislature must provide in the state's district schools.[1]

¶ 186. As the majority opinion notes, the power to establish schools is inherent in state government, and so the education article of the Wisconsin Constitution has always been interpreted as a directive compelling the legislature to exercise its power for the establishment of a public school system rather than as an organic grant of legislative authority over education. Majority op. at ¶ 29. *Zweifel v. Joint Dist. No. 1,* 76 Wis. 2d 648, 658, 251 N.W.2d 822 (1977); *Buse v. Smith,* 74 Wis. 2d at 564; *Manitowoc v. Manitowoc Rapids,* 231 Wis. 94, 97, 285 N.W. 403 (1939).

---

[1] *See* Justice Prosser's concurrence in part, dissent in part, which I join.

The specific constitutional guarantee of education flows from the provision that the legislature provide for the establishment of district schools. Since the power to establish schools existed without a specific grant as an inherent function of state government, the clear purpose of art. X, sec. 3, was to compel the exercise of the power to the extent designated. Art. X, sec. 3, must then be viewed as a limitation upon the broad power of the state to educate its citizens through the establishment and operation of schools. The limitations are precisely stated: District schools, uniformity, and free tuition for certain ages.

*Zweifel*, 76 Wis. 2d at 658 (citation omitted). *See also Manitowoc*, 231 Wis. at 98 ("the purpose [of art. X, § 3] was not to grant a power to the legislature to establish schools, for this power would exist without grant, but to compel the exercise of the power to the extent designated"); *Outagamie County v. Zuehlke*, 165 Wis. 32, 35–36, 161 N.W. 6 (1917)("It is established by the decisions of this court that our state constitution is not so much a grant as a limitation of power, therefore the state legislature has authority to exercise any and all legislative powers not delegated to the federal government nor expressly or by necessary implication prohibited by the national or state constitution.").

¶ 187. However, art. X, § 3 says only that the legislature must establish uniform public schools, free and open to all. It does nothing to either prescribe or limit instructional character or content, leaving it exclusively to the legislature, which had inherent authority over it to begin with.

¶ 188. The lower courts, some members of the legislature and some amici complained about the lack of a constitutional definition or standard for the right

to education under art. X, § 3.[2] The court has responded to these complaints by adopting a broad new definition of the right to education that is as breathtaking in scope as it is disconnected to anything in the text of the constitution.

¶ 189. The court's new definition of the right to education is grounded in ideas about constitutional educational adequacy found in the law reviews and the decisions of other state supreme courts, measured by reference to the sufficiency of instruction and the equal opportunity to become proficient in specific curricular subjects. Majority op. at ¶¶ 48–52. The new approach emphasizes the objective of equalizing student outcomes, although the majority opinion notes that unequal student scores on proficiency tests would not be enough alone to make out a constitutional violation. Majority op. at ¶¶ 51–53, n.21. The court's new standard is linked in part to statutes prescribing curricular requirements for the public schools. Majority op. at ¶ 51.

¶ 190. The newly-minted constitutional right is as follows: "Wisconsin students have a fundamental right to an equal opportunity for a sound basic education. An equal opportunity for a sound basic education is one that will equip students for their roles as citizens and enable them to succeed economically and personally." Majority op. at ¶ 3. The new right to education includes "the opportunity for students to be proficient in mathematics, science, reading and writing, geography, and history, and for them to receive instruction in

---

[2] The Wisconsin Constitution nowhere mentions the "right to education." It is not contained in the Declaration of Rights, art. I, nor anywhere in the education article. It is a judicial extrapolation from the uniformity clause of art. X, § 3. *Busé v. Smith*, 74 Wis. 2d 550, 567, 247 N.W.2d 141 (1976).

the arts and music, vocational training, social sciences, health, physical education and foreign language, in accordance with their age and aptitude." *Id.* There is more: "An equal opportunity for a sound basic education acknowledges that students and districts are not fungible and takes into account districts with disproportionate numbers of disabled students, economically disadvantaged students, and students with limited English language skills." *Id.* And the legislature must henceforward provide "sufficient resources" to meet the new standard; otherwise, it will be in violation of art. X, § 3. *Id.*

¶ 191. The problem with all of this is that there is no support for it anywhere in the text of the Wisconsin Constitution. It is entirely the product of judicial invention, despite efforts to tie some parts of the standard to particular statutory enactments. This may be fine education policy, and as a parent and a citizen I certainly support the educational aspirations and goals expressed by the new standard, as well as the requirement that schools include instruction in the specified curricular subject areas. But as a judge, I am compelled to say as forcefully as I can that the court's exercise in education clause standard-writing has nothing whatsoever to do with constitutional law.

¶ 192. In my judgment, any attempt by this court to create a constitutional standard or definition of the right to education based upon ideas about educational adequacy, outcomes and curricular offerings is seriously misguided. It encroaches upon the prerogatives of the legislative branch of government, implicating separation of powers principles and bringing into play the political question doctrine of *Baker v. Carr*, 369 U.S. 186 (1962). The judiciary should not be drawn into deciding issues that are essentially political in nature,

exclusively committed by the constitution to another branch of government and not susceptible to judicial management or resolution. This is clearly such an issue.

¶ 193. In *Baker* the United States Supreme Court established the basic framework for analyzing the justiciability of political questions:

> The nonjusticiability of a political question is primarily a function of the separation of powers. Much confusion results from the capacity of the 'political question' label to obscure the need for case-by-case inquiry. Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.
>
> . . . .
>
> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 210–11, 217. *See also Nixon v. United States*, 506 U.S. 224, 228–29 (1993); *Powell v. McCormack*, 395 U.S. 486, 518–19 (1969). The Court in *Baker* ultimately found the reapportionment issue before it to be justiciable, a conclusion followed by this court in *State ex rel. Reynolds v. Zimmerman*, 22 Wis. 2d 544, 561–64, 126 N.W.2d 551 (1964), overruling *State ex rel. Broughton v. Zimmerman*, 261 Wis. 398, 52 N.W.2d 903 (1952), and *State ex rel. Martin v. Zimmerman*, 249 Wis. 101, 23 N.W.2d 610 (1946).

¶ 194. It is, of course, the duty and particular province of the judiciary to interpret the constitution and say what the law is. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803); *State ex rel. Wisconsin Senate v. Thompson*, 144 Wis. 2d 429, 436, 424 N.W.2d 385 (1988).[3] I am fully aware that the doctrine of political question nonjusticiability is rarely invoked and in fact has not been directly applied by this court on a question of state constitutional law since *Baker*.

¶ 195. I am convinced, however, of the doctrine's applicability to art. X, § 3, at least to the extent that this court has now ventured into creating a constitutional standard or test for "educational adequacy." My conclusion is based upon the text of art. X, § 3, the obvious lack of judicially discoverable or manageable standards for educational adequacy, and the impossibility of deciding the issue without undertaking an initial, clearly nonjudicial policy determination.

---

[3] *See also The Federalist, No. 78* (Alexander Hamilton) ("The interpretation of the laws is the proper and peculiar province of the courts. A constitution is, in fact, and must be regarded by the judges, as a fundamental law. It therefore belongs to them to ascertain its meaning, as well as the meaning of any particular act proceeding from the legislative body").

¶ 196. Under the *Baker* analysis, "the concept of a textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving it; the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Nixon*, 506 U.S. at 228–29. As I have already noted, while it is clear that art. X, § 3 is not a grant of legislative power but a direction that legislative power be exercised in a particular way, the text of the education article nonetheless supports the conclusion that this is an area that is committed entirely to the legislative branch. Authority over public education is inherent in the legislature; art. X, § 3 does nothing more than command its exercise for the creation and support of a system of generally uniform, tuition-free, district schools.[4] The constitution is silent on the issue of the scope, content or character of the education provided by the public schools.

¶ 197. In addition, the task of filling in the constitutional gaps is clearly a judicially unmanageable one, as the profound breadth and soaring rhetoric of the court's new standard demonstrate. More fundamentally, just how much education is adequate to the requirements and expectations of students, parents and society at any given point in time manifestly involves policy determinations of a nonjudicial type.

¶ 198. Finally, there is uncertainty and risk inherent in multiple and conflicting pronouncements about education policy emanating from different

---

[4] Of course, if the legislature suddenly started charging tuition or turning students away there would be a justiciable claim for violation of art. X, § 3. The text is explicit as to these matters, which are clearly capable of judicial resolution and remedy.

branches of government. By constitutionalizing the notion of "educational adequacy" (however we would choose to define it), we create the potential for never-ending school finance litigation.

¶ 199. The majority opinion refers to the necessity of adopting an adequacy-based constitutional standard for education "as a goad or as a backstop to the legislature. . . ." Majority op. at ¶ 50. But no legislature can ever satisfy everyone, particularly in a policy area so fraught with nuances and competing interests as this one. The constitutional right to education announced by the court today guarantees not better schools but bi-annual school finance litigation, as dissatisfied combatants in the battle for state education budget dollars go to court with claims of educational "inadequacy."

¶ 200. The majority dismisses the justiciability issue by reference to the unremarkable fact that this court has entertained art. X, § 3 challenges before, in *Kukor, Busé* and *Zilisch*. Majority op. at ¶ 2, n.2. In other words: "We've gone a little way down this road before, why not continue further?" This is poor constitutional justification for the exploration in educational policymaking the court engages in today. The difference, of course, between this case and the earlier ones is that this court has never before arrogated to itself, under the guise of constitutional interpretation, the power to dictate educational content, character or scope.[5] Not until today.

---

[5] There is unfortunate dicta in *Busé v. Smith*, 74 Wis. 2d 550, 247 N.W.2d 141 (1976), which suggests that this court has the authority to dictate the subjects to be taught in the public schools. Referring to the distinction drawn in *State ex rel. Zilisch v. Auer*, 197 Wis. 284, 221 N.W. 860 (1928), between the "character of instruction" and the mechanics of school district

¶ 201. I recognize that courts in other states have attempted to define the parameters of their state constitution education clauses by reference to variations on the "educational adequacy" theme. Majority op. at ¶¶ 48–50. However, I am persuaded by the reasoning of the Illinois Supreme Court, which invoked the political question nonjusticiability doctrine in declining to follow the trend:

> What constitutes a "high quality" education, and how it may best be provided, cannot be ascertained by any judicially discoverable or manageable standards. The constitution provides no principled basis for a judicial definition of high quality. It would be a transparent conceit to suggest that whatever standards of quality courts might develop would actually be derived from the constitution in any meaningful sense. Nor is education a subject within the judiciary's field of expertise, such that a judicial role in giving content to the education guarantee might be warranted. Rather, the question of educa-

---

creation, the court in *Busé* stated: "If 'character of instruction' was all that was required to be 'as nearly uniform as practicable' under the mandate of the constitution, then it was left up to this court to ultimately determine what subjects were to be included in 'character of instruction' and to the legislature to determine what uniformity was 'practicable.'" *Busé*, 74 Wis. 2d at 566. This statement was completely unnecessary to the holding in *Busé*, which concerned the very technical issue of the constitutionality of the negative aids formula. *Zilisch* itself was a challenge to school district boundaries. Despite their expansive language, neither *Busé* nor *Zilisch* concerned the issue of whether art. X, § 3 mandates a certain content or character of education. I would withdraw the foregoing language from *Busé*. There is nothing in the text of art. X, § 3, nor in *Zilisch* or any of our cases, to support the proposition that this or any other court has a role in curriculum decisions.

tional quality is inherently one of policy involving philosophical and practical considerations that call for the exercise of legislative and administrative discretion.

To hold that the question of educational quality is subject to judicial determination would largely deprive the members of the general public of a voice in a matter which is close to the hearts of all individuals in Illinois. Judicial determination of the type of education children should receive and how it can best be provided would depend on the opinions of whatever expert witnesses the litigants might call to testify and whatever other evidence they might choose to present. Members of the general public, however, would be obliged to listen in respectful silence. We certainly do not mean to trivialize the views of educators, school administrators and others who have studied the problems which public schools confront. But nonexperts—students, parents, employers, and others—also have important views and experiences to contribute which are not easily reckoned through formal judicial factfinding. In contrast, an open and robust public debate is the lifeblood of the political process in our system of representative democracy. Solutions to problems of educational quality should emerge from a spirited dialogue between the people of the State and their elected representatives.

*Committee for Educ. Rights v. Edgar*, 672 N.E.2d 1178, 1191 (Ill. 1996). *See also Coalition for Adequacy and Fairness in Sch. Funding, Inc. v. Chiles*, 680 So. 2d 400, 408 (Fla. 1996)(challengers of school finance system failed to present "an appropriate standard for determining [educational] 'adequacy' that would not present a substantial risk of judicial intrusion into the powers and responsibilities assigned to the legislature").

684

¶ 202. So it is here. The expansive constitutional right to education announced and explicated by the court today is not derived from the constitution in any meaningful sense, and it is entirely inappropriate in our representative system to resolve disputes over educational content, adequacy or finance through art. X, § 3 litigation. To invoke the political question doctrine of nonjusticiability here is not to abdicate the responsibility of judicial review but to vindicate the democratic process by which these sorts of issues are best resolved. This does not leave the legislature to exercise its authority over education issues unchecked. The checks and balances of the ballot box are oftentimes far more effective than those of a coordinate branch of government.

¶ 203. Accordingly, I cannot subscribe to parts II and V, or paragraph 3 of the majority opinion, in which the court articulates a new constitutional "right to education" under art. X, § 3. Therefore, I respectfully concur in parts I and III of the majority opinion, but in other respects, I dissent.

¶ 204. I am authorized to state that Justice DAVID T. PROSSER, joins this opinion.